## ROSS v. ESQUIRE, Inc.
### No. 134.

Circuit Court of Appeals, Second Circuit.
Jan. 10, 1938.

David Haar, of New York City, for appellant.

Duncan & Mount, of New York City (Frank A. Bull and John H. Galloway, Jr., both of New York City, of counsel), for appellee.

Before MANTON, L. HAND, and CHASE, Circuit Judges.

MANTON, Circuit Judge.

Plaintiff appeals from a judgment entered on a jury's verdict of $500 in his favor. He charges errors in the exclusion of evidence, and in the court's instructions

to the jury which prevented him from receiving full damages for the injury due to a libel published by the defendant.

The action is based on the publication by the defendant in its issue of "Esquire" for August, 1936, of an article written by one Scully entitled "Now It Can Be Sold." The alleged libel reads:

"An advance royalty check for $2,500 arrived by cable from New York. It came to Vittel and I had it forwarded on to Harris in Nice. According to our contract I was to be paid 20 per cent. of that immediately.

"Instead of $500, a thousand francs, or about $39, did arrive, with the explanation that only $2,000 had come through, as Arthur Ross, the lawyer, had extracted $500 for past debts before cabling the money from New York. Already, I observed, I was being rouled at both ends.

"My contract with Harris read that I should be paid directly from the publishers, but everybody was so absent-minded they forgot to insert that clause in the contract. I must have been absent-minded too, as I had no ambulance-chaser of my own on the case."

The plaintiff is a lawyer, 30 years in practice, of culture and good reputation, and enjoyed an excellent professional employment. The article in which the libelous passages, as to the plaintiff, appeared, need not be here presented in its entirety. It is sufficient to say that the writer described himself as "Variety Mugg," and was correspondent for "Variety" in Nice, France, and tells in his article that he "ghosted" the biography of George Bernard Shaw, which was ostensibly written by Frank Harris, a noted writer. "Esquire" published the article in full. Scully reveals that the purpose of publishing the story was to get revenge on Shaw because of "a two year old grudge" that he was "nursing" against him. He tells how the publication of the article was so timed that the August "Esquire" would reach London just in time for Shaw to read it on his 80th birthday, thus giving "a little birthday token." He announced not alone that he wrote the book, but how he wrote it, and he uses over 7,000 words to tell his story. The original article which appeared in "Esquire" was illustrated on one page by a bust of Shaw in caricature and on another by a sketch of Scully about to don a mask of Frank Harris. The publishers of the book were in New York and were boyhood friends of Scully. Scully drew a contract between Harris and himself whereby Scully was to receive 20 per cent. of the royalties and Harris 80 per cent. Later he discovered that he had given himself 80 per cent. and Harris 20 per cent. The next day he reversed the percentages and tried to persuade Harris to give him 30 per cent., but Harris insisted that he had to pay plaintiff, his New York lawyer, 10 per cent., and for that reason he could not pay more than 20 per cent. Scully then pointed out that in such case he would be paying plaintiff, Ross. After he had finished the book, he succeeded in having Harris increase his royalties from 20 to 30 per cent. Finally one day while in Vittel, France, $2,500 arrived by cable from New York. He sent it to Harris in Nice. This money was a payment made upon signing the contract for the publication of the book, and it is concerning this that he wrote the libelous article.

Whether the article is libelous is judged by what the ordinary reader would take its meaning to be, and the jury might well have found it to mean that the plaintiff had extracted $500 for past debts before cabling the money from New York and that in so doing he had "rouled" Scully; also whether or not it charged that plaintiff was an "ambulance chaser." "Rouled" is a French word meaning "swindled, cheated or flimflammed."

At the trial plaintiff offered testimony to show that he did not send $2,500 nor did he retain any part of it for himself and to show the facts so far as he was concerned. This testimony was excluded. Plaintiff was attempting to prove the falsity of the statement relating to him in the article. It was proper for him to prove the statement to be false both as to his sending the money or extracting any part of it from the advance royalties of $2,500. The jury might well have found that it was a libel of the plaintiff for "Esquire" to publish a statement that he has transmitted the balance of $2,500 advanced, having abstracted $500 thereof when in fact he did not do so. He tried to prove the amount that he did cable, but the court would not permit him to do so. He also attempted to prove that he received a check from the publisher and the amount thereof. Proof that the publishers did not pay $2,500 on the signing of the contract

or at any other time, and proof that the amount the plaintiff received from them was not $2,500 at the time or at any other time, and proof of the amount that the plaintiff cabled to Harris in Vittel at that time or any other time, would have had a bearing on the malice of the article. Plaintiff was entitled to testify to the facts concerning this situation, for a part of the article was a false statement relating to payments made by the publishers and its amount, and the cabling of the money to Harris and its amount. Malice in some cases may be implied from the publication itself where the natural inference from the libel is that it was aimed directly at imputation. But, where the inference does not flow naturally from its facts, adequate evidence of actual malice or its equivalent may be produced if punitive damages are sought. Corrigan v. Bobbs-Merrill Co., 228 N.Y. 58, 126 N.E. 260, 10 A.L.R. 662; Marx v. Press Pub. Co., 134 N.Y. 561, 31 N.E. 918.

It was error to exclude this testimony offered, and the judgment must therefore be reversed and a new trial is ordered.

Judgment reversed.