The **WASHINGTON POST COMPANY,**
Appellant,

v.

Eugene J. **KEOGH,** Appellee.

No. 19668.

United States Court of Appeals
District of Columbia Circuit.

Argued April 6, 1966.

Decided July 28, 1966.

Mr. James H. McGlothlin, Washington, D. C., with whom Mr. Michael S. Horne, Washington, D. C., was on the brief, for appellant.

Mr. Philip Handelman, Washington, D. C., for appellee.

Before WILBUR K. MILLER, Senior Circuit Judge, and WRIGHT and McGOWAN, Circuit Judges.

J. SKELLY WRIGHT, Circuit Judge:

This appeal presents for consideration in a summary judgment context an application of the public official libel principle enunciated in New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Appellee, a United States Congressman from New York, sued the Washington Post and its syndicated columnist, Drew Pearson, for alleged libelous information appearing in two of Pearson's columns (appendices to this opinion) published in the Post. Without surrendering the defense of truth on the merits, the Post moved for summary judgment on the ground that the record raised no genuine issue as to actual malice on its part. The District Court, although "aware that there is substantial ground for a difference of opinion as to the law which we have cited in supporting this holding," distinguished Times[1] and, finding itself in "doubt,"

---

1. The New York Times was sued for publishing an advertisement criticizing alleged misuse of police power in Alabama and purportedly citing specific instances of police brutality. The advertisement had been sent to the newspaper along with a letter signed by A. Philip Randolph stating that numerous prominent persons had sponsored the advertisement and had authorized use of their names. News stories in the Times' own files would have revealed the falsity and distortion in the advertisement. A call to any of the alleged sponsors would have revealed that their names had been used without permission. But the advertisement was printed without any check against these stories and without any attempt to contact the alleged sponsors. This may have been enough evidence to raise an issue

denied the motion for summary judgment and certified the case for interlocutory appeal, 28 U.S.C. § 1292(b). Keogh v. Pearson, D.D.C., 244 F.Supp. 482, 486 (1965). We reverse.

## I

██ ██ The governing rule of law, announced in *New York Times*, is that public officials may sue for libel only when they can demonstrate the statement was made with "actual malice," which is defined to mean publication of false statements with actual knowledge of their falsity or with reckless disregard for their truth or falsity. In Garrison v. State of Louisiana, 379 U.S. 64, 74, 85 S.Ct. 209, 216, 13 L.Ed.2d 125 (1964), the Court refined its standard, stating that "only those false statements made with the high degree of awareness of their probable falsity demanded by *New York Times* may be the subject of either civil or criminal sanctions." And in Henry v. Collins, 380 U.S. 356, 357, 85 S.Ct. 992, 13 L.Ed.2d 892 (1965), the Court reversed on the *certiorari* papers a judgment based upon an instruction allowing the jury to infer malice from the falsity and libelous nature of a statement, pointing out this instruction allowed the jury to find malice from "intent to inflict harm" rather than from "intent to inflict harm through falsehood."

██ The obvious purpose of these cases is to create a rule of law more restrictive for public official plaintiffs than the pre-*Times* practice of allowing juries to infer malice from the face of defamatory publications. *E. g.*, Ross v. Esquire, Inc., 2 Cir., 94 F. 2d 75, 77 (1938). Malice, under the pre-*Times* practice, was equated with hostility, vindictiveness or negligent disregard of reputation. Under the *Times* test false statements made with these motives alone are not actionable; maliciousness may be shown only through knowledge of falsity or reckless disregard of truth or falsity. It is in light of this standard that the evidence in this case must be examined to determine whether summary judgment should have been granted.

██ A motion for summary judgment should be granted where it is shown that no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. In deciding whether a genuine issue of fact is raised in any case, a number of general considerations are relevant. First, the right to trial by jury is at stake, so courts must be ever careful to grant summary judgment only when no issue of fact is controverted or turns upon a choice between permissible inferences from undisputed evidence. See Pierce v. Ford Motor Co., 4 Cir., 190 F.2d 910, cert. denied, 342 U.S. 887, 72 S.Ct. 178, 96 L.Ed. 666 (1951). This need for care has given rise to the valid generalizations that summary judgment must be denied when there is "doubt" whether an issue of fact has been raised, and that summary judgment is not usually appropriate when the issue raised concerns a subjective state of mind.

██ These generalizations do not, however, relieve courts of their responsibility to decide whether a genuine issue of fact exists. That doubt concerning the issue should be resolved against the movant may assist courts in disposing of troubling cases after deliberation, but it provides no assistance in the deliberative process itself. That state of mind should generally be a jury issue does not mean it should always be so in all contexts,[2]

---

of fact on negligence, but the Court ruled it was a constitutionally impermissible evidentiary basis for a libel prosecution by a public official where the Times personnel involved had filed affidavits disclaiming any knowledge which should have caused them to believe anything in the advertisement was false.

2. The proposition that state of mind should generally be a jury issue orginated in Poller v. Columbia Broadcasting System, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962), where the Court stated:

" * * * We believe that summary procedures should be used sparingly in

especially where the issue is recklessness, which is ordinarily inferred from objective facts. Summary judgment serves important functions which would be left undone if courts too restrictively viewed their power. Chief among these are avoidance of long and expensive litigation productive of nothing, and curbing the danger that the threat of such litigation will be used to harass or to coerce a settlement. Asbill & Snell, Summary Judgment Under the Federal Rules—When an Issue of Fact is Presented, 51 MICH.L.REV. 1143, 1144 (1953).

In the First Amendment area, summary procedures are even more essential. For the stake here, if harassment succeeds, is free debate. One of the purposes of the *Times* principle, in addition to protecting persons from being cast in damages in libel suits filed by public officials, is to prevent persons from being discouraged in the full and free exercise of their First Amendment rights with respect to the conduct of their government. The threat of being put to the defense of a lawsuit brought by a popular public official may be as chilling to the exercise of First Amendment freedoms as fear of the outcome of the lawsuit itself, especially to advocates of unpopular causes. All persons who desire to exercise their right to criticize public officials are not as well equipped financially as the Post to defend against a trial on the merits. Unless persons, including newspapers, desiring to exercise their First Amendment rights are assured freedom from the harassment of lawsuits, they will tend to become self-censors. And to this extent debate on public issues and the conduct of public officials will become less uninhibited, less robust, and less wide-open, for self-censorship affecting the whole public is "hardly less virulent for being privately administered." Smith v. People of State of California, 361 U.S. 147, 154, 80 S.Ct. 215, 219, 4 L.Ed.2d 205 (1959).

The Supreme Court has made clear that public officials, including Congressmen, are immune from liability for statements, however false and defamatory, made in the course of their official duty. Barr v. Matteo, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959). The other side of that coin is that public officials do not have the same protection from libelous statements as private victims. "It would give public servants an unjustified preference over the public they serve, if critics of official conduct did not have a fair equivalent of the immunity granted to the officials themselves." New York Times Co. v. Sullivan, *supra*, 376 U.S. at 282–283, 84 S.Ct. at 727.[3]

---

complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot. It is only when the witnesses are present and subject to cross-examination that their credibility and the weight to be given their testimony can be appraised. * * * " (Footnote omitted.)

This statement was re-echoed in White Motor Co. v. United States, 372 U.S. 253, 259, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963). Summary judgment had been granted in both cases under an erroneous view of the law. In *Poller* the District Court ruled that, even if the defendant's motive and intent were to violate the Sherman Act, such motive was irrelevant since plaintiff's economic injury was caused by defendant's exercise of its legal rights. D.D.C., 174 F.Supp. 802, 805 (1959). This Court of Appeals affirmed at least partially upon the same reasoning. 109 U.S.App.D.C. 170, 174, 284 F.2d 599, 603 (1960). In *White Motor Co.* summary judgment was granted on the theory that defendant's actions amounted to a *per se* violation of the Sherman Act. The Supreme Court, in both cases, held that motive was relevant. Thus the Court's statements cannot be read as directed at a practice of granting summary judgment too often when motive is relevant, since the error in those cases lay in the legal rule applied by the lower courts. The Court did go on to analyze the evidence in *Poller* and ruled that summary judgment would be inappropriate under the proper legal standard. The evidence there of unlawful intent, however, was far more susbtantial than in this case. 368 U.S. at 469–473, 82 S.Ct. 486.

3. In announcing these reciprocal principles the Court recognized that some public

## II

The evidence on the motion for summary judgment shows that Pearson has been writing a daily column for many years and that this column is published in more than 600 newspapers with a daily circulation of over forty million. The Post filed depositions of three employees and affidavits by its editor and an assistant managing editor indicating that before publication each of the Post personnel deposing had read one or both of the columns and had no reason to believe or evidence causing them to suspect the information contained in them was false. In opposition Keogh filed the two Pearson columns and his own affidavit. The columns identified Keogh specifically and, according to the complaint, intended to convey that Keogh took bribes which influenced his official actions and votes, and that he had attempted to bribe a federal judge "but was spared from prosecution because of his close political association with the President and Attorney General of the United States." Keogh's affidavit neither related to the information contained in the columns nor contradicted the depositions and affidavits of the Post personnel. It attempted to demonstrate, through a series of excerpts from various magazine and newspaper articles, that Pearson's "reputation for accuracy and veracity" is such "that mere reliance upon his word is grossly negligent and reckless."

It is undisputed that no issue of fact exists here as to publication with actual knowledge of falsity. The unimpeached Post personnel depositions are dispositive of this issue. Orvis v. Brickman, 90 U.S.App.D.C. 266, 196 F.2d 762 (1952). Rather, Keogh asserts the columns were published with reckless disregard for their truth or falsity. His principal argument on appeal, accepted by the District Court, is that the "character and content of the publication itself" is sufficient to take the case to the jury on actual malice, in light of the Post's failure to check the accuracy of Pearson's columns before publication.[4] The Supreme Court held in *Times*, of course, that the character and content of the publication there involved was a constitutionally impermissible evidentiary basis for a finding of actual malice, even though the Times had failed to verify its contents. Keogh's attempt to distinguish *Times* on grounds that Pearson's columns specifically identified Keogh and that they contained "more serious" allegations than those made in *Times* is unconvincing. There may be some collateral significance in the fact that Pearson's columns specifically identified Keogh,[5]

officials may be unpopular because of the duties they are required to perform and, consequently, would be susceptible to actions for libel brought against them in an unfavorable climate. The popularity and influence of a public official, on the other hand, may stand him in good stead in any libel action brought in his behalf. See Garrison v. State of Louisiana, supra, 379 U.S. at 73–74, 85 S.Ct. 209. Three Justices in both *Garrison* and *Times* felt a person charged with libel by a public official should have the same absolute immunity as the public official when their rules are reversed.

4. The District Court certified the following question:

"1. Does the new definition of actual malice not only preclude per se presumptions of malice, but also prohibit the drawing of any implication of malice whatsoever from the face of the defamation? If so, the defamatory nature

of this publication would be immaterial. Lacking any further proof of actual malice, defendant's affidavits asserting actual ignorance would be an adequate defense and this matter could be decided by summary judgment as a matter of law."
244 F.Supp. at 486.

5. When an alleged libel is specifically aimed at an identified individual there is no problem of determining whether a statement concerning a group of persons, or otherwise unclear as to whom it refers, should be read to apply specifically to to the individual plaintiff. See Rosenblatt v. Baer, 383 U.S. 75, 80–83, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966). Specific identification of a defamed individual does not, however, make verification significantly easier than normal, since a statement to be actionable must be "of and concerning" the plaintiff. *Id.* at 80, 86 S.Ct. 669. While specific identifica-

but this fact has no relevance to the Post's recklessness for the truth. If anything, a veiled but obvious reference to an individual in a highly critical context, as in *Times*, may more likely indicate falsity than the same criticism aimed at a specifically identified person. An inference of recklessness from publication should no more be permitted in one case than the other.

Moreover, the alleged libels here are no more serious than those in *Times, Garrison* and other cases. The advertisement in *Times* charged police brutality, intimidation, violence, bombing of Dr. Martin Luther King's home, and assault upon Dr. King's person. In *Garrison* the libel charged that all eight of the state criminal district court judges in New Orleans were influenced by racketeers. But even if it were tenable to argue that the charges here are "more serious" than those in *Times*, the seriousness of a charge, in itself, is not probative of recklessness with respect to the truth. The most serious charges, which if anything we have the most reason to avoid deterring, may be made responsibly, with no hint of anything contrary to common knowledge, while less serious charges may be made rashly, with internal inconsistencies, citing facts contrary to common knowledge. And there is no basis, empirically or in view of *Times*, for the proposition that "more serious" charges are less likely to be true than "less serious" charges. "No matter how gross the untruth, the *New York Times* rule deprives a defamed public official of any hope for legal redress without proof that the lie was a knowing one, or uttered 'in reckless disregard of the truth.' " Rosenblatt v. Baer, *supra* Note 5, 383 U.S. at 92, 86 S.Ct. at 679 (concurring opinion of Mr. Justice Stewart).[6]

Finally, Keogh presses the point that his affidavit contains evidence which proves that Pearson's reputation for veracity is such that the jury should have been permitted to decide whether the Post employees, despite their affidavits, should have known better than to print Pearson's columns without verifying his contentions.

The affidavit, however, is clearly inadmissible and appears to have been treated as such by the District Court.[7]

---

tion assures that all readers will know who is being attacked, this should properly be a matter relevant to the issue of damages, if the extent of publication is actually affected, rather than a basis for a different standard of libel.

6. Two other attempted distinctions from *Times* are worthy only of passing mention. First, the District Court pointed out that the Post pays Pearson while the Times was paid to publish the advertisement. If anything, those whom a publisher pays presumably would have more to lose by handing in untruthful defamations than a one-shot advertiser, such as in *Times*. The fact that the Post pays Pearson certainly does not associate the Post with his opinions. Second, "The Martin Luther King Committee was a petitioner and an ardent advocate of a cause," said the District Court, while "[a] publisher holds Mr. Pearson out to be a reporter of and commentator upon facts." 244 F.Supp. at 486. It is common knowledge, in fact, that newspapers often do not share the opinions and views of their commentators, and seldom if ever hold out columnists syndicated in hundreds of other newspapers as anything but individuals stating their own positions. But accepting for now the dubious factual premise that publishers hold out columnists to be reporters of and commentators upon facts, it is difficult to see why a publisher is more reckless of the truth when he prints a regular column without verification than when he prints an advertisement published by "an ardent advocate of a cause." The District Court seems to imply it is somehow less reprehensible to print the untruths of an ardent advocate than of a professional newsman. But even if we indulge the untenable assumption that Pearson and his fellow commentators and newsmen are never themselves ardent advocates of causes, it seems reasonable to argue that an ardent advocate may be more likely to exaggerate, distort and lie than a dispassionate advocate or a non-advocate, and that publishers should be more on guard against untruth in a case like *Times* than in this case.

7. Although the court mentioned considering the affidavit along with everything else in its original order denying summary

Rule 56(e), Fed.R.Civ.P., requires that "[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." [8] Keogh's affidavit runs afoul of Rule 56(e) in several respects. First, it is not based on personal knowledge, but asserts and relies on the truth of charges about which plaintiff does not claim to know anything. See Lark v. West, D.D.C., 182 F.Supp. 794, 798 (1960), affirmed per curiam, 110 U.S.App.D.C. 157, 289 F.2d 898, cert. denied, 368 U.S. 865, 82 S.Ct. 114, 7 L.Ed.2d 63 (1961). Second, the affidavit does not set forth facts admissible in evidence, see Rule 43 (a), Fed.R.Civ.P., as the allegations are almost all hearsay. Jameson v. Jameson, 85 U.S.App.D.C. 176, 178, 176 F.2d 58, 60 (1949) (Clark, J.). Third, sworn or certified copies of all papers referred to in the affidavit are not attached, as the rule requires. Steven v. Roscoe Turner Aeronautical Corporation, 7 Cir., 324 F. 2d 157, 7 A.L.R.3d 1332 (1963) (public records); Allstate Finance Corporation v. Zimmerman, 5 Cir., 296 F.2d 797 (1961) (other papers). See generally 6

Moore, *op. cit. supra* Note 8. It cannot, therefore, be relied upon to raise a genuine issue of fact.

### III

Even if the affidavit were admissible, or had been treated as such by the District Court as appellant contends, still no genuine issue of fact would be raised. It is true that a publisher has reason to suspect a publication's accuracy where he knows or should know that the author or endorser is persistently inaccurate.[9] But given its broadest possible significance, Keogh's affidavit shows only that Pearson had made erroneous statements on a very few prior occasions, and that he has a controversial reputation.[10]

The significance of this evidence must be judged in light of the relevant standard of law. As the Court indicated in *Times*, evidence offered in a libel case might be sufficient to raise a jury question as to a publisher's negligence but insufficient to raise one as to his actual malice.[11] Proof of isolated instances of inaccuracy, therefore, in a 35-year career during which Pearson has published well over 10,000 columns, cannot be accorded significance, since the relevant rule of law contemplates that "erroneous state-

---

judgment, it did not mention the affidavit in its opinion. The question it certified to this court confirms the view that the affidavit was treated as inadmissible. Note 4, *supra*.

8. See 6 MOORE, FEDERAL PRACTICE ¶ 56.-22[1] (2d ed. 1965); 3 BARRON & HOLTZOFF, FEDERAL PRACTICE AND PROCEDURE § 1237 (Wright ed. 1958).

9. This does not mean, however, that a publisher necessarily takes a chance when he prints without reliance upon an author's or endorser's reputation for veracity. In *Times* there was no proven reliance upon the good reputation of endorsers, since the advertisement was accepted without any verification that the persons listed as sponsors had in fact originated or approved the statements made.

10. The only story in the affidavit directly related to Pearson's reputation for veracity is anything but convincing. It says Pearson was rated in 1944 by Washington correspondents as top in national influence, but only tenth in "reliability,

fairness, ability to analyze the news." This dated appraisal does not indicate where Pearson would have stood on reliability alone, and in any event "tenth" may well be an enviable rating.

11. New York Times Co. v. Sullivan, *supra*, 376 U.S. at 288, 84 S.Ct. 710. *Accord*, in a summary judgment context, Braughton v. United Air Lines, Inc., W.D.Mo., 189 F.Supp. 137 (1960); Hufner v. Erie R. Co., S.D.N.Y., 26 F.Supp. 855 (1939), holding that evidence of ordinary negligence may be valueless when judged in light of the standard of gross or wanton negligence. Also, evidence of some degree of intervention by a principal to control the details of an agent's performance may not necessarily raise a genuine issue of fact over whether the agent is an "employee" rather than an "independent contractor"; the interventions must not be "trivial in amount and character * * *," but "enough to color the whole relation." Radio City Music Hall Corp. v. United States, 2 Cir., 135 F.2d 715 (1943) (L. Hand J.).

ment is inevitable in free debate, and * * * it must be protected if the freedoms of expression are to have the breathing space they need to survive." Garrison v. State of Louisiana, supra, 379 U.S. at 74, 85 S.Ct. at 216. Proof of a controversial reputation, even of a reputation for indecency or vulgarity, likewise is irrelevant. "The most repulsive speech enjoys immunity provided it falls short of a deliberate or reckless untruth." Linn v. United Plant Guard Workers, 383 U.S. 53, 63, 86 S.Ct. 657, 663, 15 L.Ed.2d 694 (1966). Ours is a "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." New York Times Co. v. Sullivan, supra, 376 U.S. at 270, 84 S.Ct. at 721. The actual malice test, designed to give practical effect to this commitment, precludes an issue of fact in this case.[12]

### IV

There simply is no convincing, realistic basis for the position that newspapers in circumstances similar to the Post's should bear greater responsibilities of verification than the Supreme Court required of the New York Times, where information available from published articles in the Times' own files "demonstrated the falsity of the allegations." New York Times Co. v. Sullivan, supra, 376 U.S. at 263, 84 S.Ct. at 717. Verification of syndicated news reports and columns is a time-consuming process, a factor especially significant in the news-paper business where news quickly goes stale, commentary rapidly becomes irrelevant, and commercial opportunity in the form of advertisements can easily be lost. In many instances considerations of time and distance make verification impossible. Thus the newspaper is confronted with the choice of publication without verification or suppression. Verification is also a costly process, and the newspaper business is one in which economic survival has become a major problem, made increasingly grave by the implications of this fact for free debate. We should be hesitant to impose responsibilities upon newspapers which can be met only through costly procedures or through self-censorship designed to avoid the risks of publishing controversial material. The costliness of this process would especially deter less established publishers from taking chances and, since columns such as Pearson's are highly popular attractions, competition with publishers who can afford to verify or to litigate would become even more difficult.[13] It is highly unlikely, moreover, that the form of journalism engaged in by Pearson and other columnists could survive in the face of a rule requiring verification to negate recklessness. Pearson and his fellow columnists seek and often uncover the sensational, relying upon educated instinct, wide knowledge and confidential tips. Verification would be certain to dry up much of the stream of information that finds its way into their hands. Whether or not this would please a number of us is irrelevant. What matters is that a rule requiring verification in the absence of evidence

---

12. See Walker v. Courier-Journal and Louisville Times Co., W.D.Ky., 246 F.Supp. 231 (1965), appeal pending, 6 Cir., No. 16,999; Arscott v. Washington Post Co., D.D.C., Civil Action No. 1025-61 (May 20, 1964); Gilberg v. Goffi, 21 A.D.2d 517, 251 N.Y.S.2d 823 (1964), affirmed per curiam, 15 N.Y.2d 1023, 260 N.Y.S.2d 29, 207 N.E.2d 620 (1965); Schneph v. New York Post Corporation, 23 A.D.2d 822, 259 N.Y.S.2d 775 (1965).

13. The Court has allowed libel suits by employers and unions in state courts, but it recognized that such suits might "dampen the ardor of labor debate and truncate the free discussion envisioned by the Act, * * * might be used as weapons of economic coercion," and might, "in view of the propensity of juries to award excessive damages for defamation, * * * pose a threat to the stability of labor unions and smaller employers." Linn v. United Plant Guard Workers, supra, 383 U.S. at 64, 86 S.Ct. at 664. The *Times* rule was adopted to avoid these dangers.

that the publisher had good reason to suspect falsity would curtail substantially a protected form of speech.

Reversed.

## APPENDIX A

### THE WASHINGTON MERRY-GO-ROUND

THE WASHINGTON POST

Tuesday, December 12, 1961

BOB KENNEDY IN EMBARRASSING SPOT

By Drew Pearson

The worst New York judicial bribery scandal in the past quarter of a century illustrates the embarrassing predicament in which the President has put his brother by making him Attorney General.

The details of this scandal were published in this column six weeks ago—Oct. 29—and need not be repeated here.

The important fact which causes embarrassment, however, is that the brother of Judge Vincent J. Keogh, charged with splitting a $35,000 bribe, is Congressman Eugene Keogh. The Congressman was one of the strong workers for John F. Kennedy's nomination at Los Angeles and necessarily was investigated, because of reports that he had been approached by the fixers. Attorney General Kennedy announced that he was not involved.

Republicans are bound to point out that in the preconvention period when Bobby Kennedy was his brother's campaign manager and was working night and day to get him nominated, Congressman Keogh was one of his best supporters. In fact, Keogh was the New York spokesman for the Kennedy forces.

Now, during the investigation of the Keoghs, the man who worked intimately with the judge's brother sits in judgment on a man who helped make his brother's election as President of the United States possible.

This position is fair neither to Attorney General Kennedy nor to Congressman Keogh and is why a campaign manager should not hold the job of Attorney General.

Bobby Kennedy, who didn't really want the job but who has been a good Attorney General, is of course following plenty of precedent. Gen. Eisenhower appointed the former chairman of the Republic National Committee and campaign manager for Governor Dewey, Herbert Brownell, as Attorney General. Mr. Truman appointed Howard McGrath, former chairman of the Democratic National Committee, as Attorney General.

This is because the Attorney General has become the chief political arm of every recent administration. No longer is the Post Office the department that hands out the political plums. Civil Service for postmasters has changed all that. The really big political power, with the right to prosecute or not prosecute, pardon or not pardon, push an income tax case or not push it, is the Justice Department.

### SPOKESMAN FOR FRANCO

Latterly Congressman Keogh has won a reputation as President Kennedy's staunchest New York supporter on Capitol Hill. Earlier, he was known as a spokesman for dictator Franco of Spain.

Keogh was elected to Congress in 1938, and for 11 years took no appreciable interest in Spain.

Then suddenly, after 11 silent years in Congress, Keogh became the champion of dictator Franco. He littered the Congressional Record with statements and editorials favorable to Spain.

### FRANCO LOBBYIST

This began in 1949. It was in 1949 also that Congressman Keogh was seen frequently in the company of Franco's lobbyist, Charles Patrick Clark, who draws $100,000 annually from the Spanish Embassy.

On Oct. 8, 1949, Congressman Keogh paid a visit to dictator Franco in Madrid.

**974**

Lobbyist Charles Patrick Clark was in Madrid with him.

Traveling on a Spanish train that night, Congressman Keogh was reported to have had $5000 stolen, together with his pants, when he hung the pants too near a window in a sleeping car.

Prior to 1949, also, Congressman Keogh opposed the natural gas lobby and voted against the Rizley bill which would have hiked gas rates.

But in 1949, Keogh and Charley Clark, lobbyist for a gas pipeline company as well as for Spain, had become friendly and Keogh reversed himself.

At about this time, Congressman Keogh began to receive a series of checks from lobbyist Charley Clark. They were listed as payments by Clark for legal advice on a tax case which the Federal Government had against Silas E. Chambers of Miami. The first check was dated March 6, 1950, for $1500; another on March 24, 1950, was for $1000; April 5, $500; May 3, $500; and June 15, $1000.

In September, 1950, some months after the checks had passed, I handed the information to the Justice Department, whereupon both Keogh and Clark were quizzed by the FBI.

Immediately the Congressman wrote a letter to Clark, dated Oct. 31, 1950, which appeared to be aimed at alibiing his transaction. It stated:

"I have given further consideration to the propriety of my continuing to act as advisory counsel. Therefore, if it meets with your approval, I should ask you to consider that our firm has withdrawn and consider that the fee which you previously paid us will be in full."

According to Keogh, Clark had merely dealt with his New York law firm, Halpin, Keogh, and St. John, not with him. But when Clark was asked how Keogh had earned these fees he explained that Keogh had given very helpful advice.

"Then it was Keogh who advised you in this case?" Clark was asked.

"Yes," was the reply.

APPENDIX B

## THE WASHINGTON MERRY-GO-ROUND
THE WASHINGTON POST
Monday, February 19, 1962
TAX REFORM MOVES STIR UP LOBBYISTS
By Drew Pearson

Nothing brings out the lobbyists on Capitol Hill like tax reforms which might hit the pocketbook interests.

Once President Kennedy showed he was serious about tightening tax loopholes, lobbyists began swarming through the capitol corridors like tourists at cherry-blossom time.

The savings and loan people, for instance, called a convention in Washington at the same time their tax privileges came up for review by the tax-writing House Ways and Means Committee.

The delegates were turned loose on Capitol Hill to bring pressure on their home-state Congressmen.

Adopting the same tactics, more than 1000 restauranteurs marched upon Washington to protest against cutting down expense-account deductions. They cried to their Congressmen that this proposal would put the champagne-caviar joints out of business.

Pickle producer H. J. Heinz organized a task force of 19 big companies to fight a proposed tax on their overseas subsidiaries. They hired public relations expert Anna Rosenberg, who has important Democratic connections, to mastermind their protest.

Other captains of industry, afraid to trust such an important matter to their hired lobbyists, have made personal pilgrimages to Capitol Hill to bring their influence to bear on the tax writers.

In fact, businessmen, bankers, industrialists, oilmen, and spokesmen for other special interests have been pouring into Washington to take up the cudgels against the tax changes.

Actually, President Kennedy wants to give businessmen a tax break in order to stimulate the economy. He has proposed an 8 per cent tax credit on new plant machinery, which would encourage modernization to meet European competition.

He would also like to step up the depreciation rate by basing it upon the economic, rather than physical, life of manufacturing equipment.

### GAPING EXEMPTIONS

These two measures would reduce tax revenue an estimated $2,800,000,000 a year. To make up for the anticipated loss, the President has asked Congress to close certain tax loopholes.

The most gaping is the tax exemption granted to savings and loan associations on 12 per cent of their revenues. If they were taxed the same as banks, the Treasury figures they should have paid $800 million in taxes last year. Instead, they paid less than $6 million.

The 44 savings and loan companies in the Greater Washington area, for example, paid less than $500 in taxes for the year.

To block Congress from increasing their tax load, the savings and loan boys have mounted a lobbying campaign that surpasses all others. They have wined and dined Congressmen, organized a Nationwide letter-writing campaign.

Glen Troop, chief lobbyist for the U.S. Savings and Loan League, has told Treasury men bluntly: "We intend to beat your brains out."

The restauranteurs have been almost as active in opposing the proposed 50 per cent cut in entertainment expenses that can be written off by businessmen.

They have invited the Congressmen, on whom they have been calling, to dine at their luxury eating places—on the house, of course.

### FRIENDLY KEOGH

Both groups have found a champion in Congressman Eugene Keogh, a power on the Ways and Means Committee, who has made a career out of representing the special interests.

A dapper Democrat who represents a "rough and tumble" Brooklyn district, Keogh actually lives outside his district, in the same swank apartment house in which the President's father, old Joe Kennedy, sometimes resides. But Keogh is more than a neighbor. He has close political ties to the Kennedys.

The President has sent word to him, however, through White House legislative chief Larry O'Brien to stop representing the special interests and start working for the public interest.

"You've had your fun," O'Brien told him. "Now the President would like you to help him put across his tax reforms."

Meanwhile, almost every company which has an overseas subsidiary has screamed to Congress against the President's plan to tax American companies at home on the profits they make abroad.

By equalizing the tax imbalance, Mr. Kennedy hopes to stop American companies from moving their operations overseas and taking jobs away from American workers.

Despite the Big Business pressure, many Congressmen are worried about this threat to employment. Even Senate Finance Chairman Harry Byrd of Virginia, who usually sides with Big Business, is cautious about opposing the President's plan.

"There is only one thing that terrifies the Congress—unemployment," he declared privately. "Congress will not tolerate unemployment."

Even the President's proposal to grant tax credits to manufacturers for modernizing their equipment is opposed by the U.S. Chamber of Commerce and the National Association of Manufacturers. However, they are losing the support of corporations they represent. The railroad, coal, textile, electronics, and machine tool industries have already endorsed the plan in defiance of the C. of C. and NAM.

Walter Heller, the President's chief economic adviser, suggested to aides that the two business groups are so accustomed to opposing Democratic proposals

their attack was probably a reflex action. He said he was reminded of the parents who wheeled their baby around Central Park, stopped at a bench to read the newspapers. The wife glanced into the buggy and screamed, "My God, we've got the wrong baby!" The husband shushed her. "Don't yell so loud. We've got a better buggy."

The C. of C. and NAM, he said, won't have anything to do with a Democratic baby.

However, the public, which has no lobbyists on Capitol Hill, is taking increased interest in reforming the tax laws.

McGOWAN, Circuit Judge:

I concur in the result reached by Judge Wright, and in Parts I and II of his opinion. The inadequacies of the Keogh affidavit under Rule 56(e), Fed.R.Civ. P., leave the record in a state where there are only the columns themselves to be measured against the unimpeached assertions by the *Post* editorial personnel that they had, on reading the columns prior to publication, no reason to believe that they were false in any respect. This does not suggest a *quantum* of proof remotely approaching "the high degree of awareness of * * * probable falsity demanded by *New York Times* * * *", which the Supreme Court said in *Garrison* was essential to the successful maintenance by public officials of either civil or criminal actions for libel. The question before us essentially is: With the proof in this state, would Keogh have been entitled to get to the jury on the issue of a reckless disregard of the matter of truth or falsity?

Although the circumstances of the Supreme Court's rescue of the New York *Times* from the rigors of the law of libel as it was applied in Alabama have little resemblance to the setting of this case, the Court has appeared to persist in foreshortening very greatly the access of public officials to the jury in defamation claims. In a case like this, where the plaintiff has not made an effective tender of any evidence—other than the al-

leged libels themselves—bearing upon reckless disregard, I do not believe that the present decisions leave room for what could, at best, be sheer speculation by the jury on that issue.

WILBUR K. MILLER, Senior Circuit Judge, dissents.