## Beimel v. Peterson

*Nicholas F. Lorenzo, Jr.,* for plaintiff.
*Philip F. Jacobus,* for defendants.

WOLFE, *P.J.*, April 28, 1981—The pleadings are closed and defendants have filed motion for summary judgment pursuant to Pa.R.C.P. 1035.

Plaintiff's cause of action is bottomed in a publication authored by defendant William R. Peterson and published by defendant, The Ridgway Publishing Company, on July 18, 1979 which is attached to the complaint as "EXHIBIT B" and reads:

"Legal yes—Ethical no!

Whenever we allude to a 'credibility gap' between elected officials and the general public, the first thing that comes to mind is the Watergate Scandal of the Nixon Administration closely followed by eight 'tainted' years of Governor Milton Shapp.

Now we have the makings of a small one in Elk County.

It is public knowledge that Ronald Beimel, 'lame duck' County Commissioner has resigned his position as Chairman to accept a position with the Idaho state association of counties. He expects to leave Elk County in the near future.

What is not public knowledge, however, is that Mr. Beimel has not resigned his office as a member of the three-man Board of Commissioners. Conceivably, he can continue to receive his salary as a County Commissioner even though he is employed by the State of Idaho.

State Representative William Wachob confirmed that what Beimel apparently intends to do is 'perfectly legal' under the present county code.

Wachob confirmed that the County Code fails to spell out the duties of elected officials so far as 'time on the job' is concerned. Presently, County officials can collect their salary regardless of how much or how little time they spend on the job. Beimel apparently intends to take advantage of that loophole to

collect his full salary until the end of his current term.

Legal . . . perhaps, but highly unethical and a slap in the face to County taxpayers.

There are steps that can be taken to prevent this situation from occurring.

First, Mr. Beimel could see the better of his actions and resign period, thus resolving the matter once and for all.

Assuming that Mr. Beimel rejects that alternative, the two remaining Commissioners, Francis Kuntz and George Lavella, could petition the court to 'recoup' his salary once he has accepted employment elsewhere. This would necessitate testifying that Mr. Beimel was no longer actively engaged in conducting the business of Elk although receiving compensation as a Commissioner.

Last, but not least, a class action suit could be brought by the taxpayers of this County demanding relief from paying the salary of an individual who obviously was not doing the job for which he or she was elected to do.

Representative Wachob further stated that he will shortly introduce legislation to put an end to such 'shenanigans' in local government. He stated that it is possible that such a bill could be passed as early as September when the House returns from its summer vacation.

We do not begrudge anyone their rightful due. As long as Mr. Beimel or anyone else remains on the job, they are entitled to draw their pay.

However, we draw the line at the thought of paying nearly $1200.00 a month to an individual who is gainfully employed half a nation away.

Perhaps, Mr. Beimel is doing all of us a favor. Regardless of the outcome of his present situation,

steps can now be taken to prevent this from ever occurring in the future.

Wachob[1] confirmed that the County Code fails to spell out the duties of elected officials so far as 'time on the job' is concerned. Presently, County officials can collect their salary regardless of how much or how little time they spend on the job. Beimel apparently intends to take advantage of that loophole to collect his full salary until the end of his current term.

Legal . . . perhaps, but highly unethical and a slap in the face to County taxpayers.

There are steps that can be taken to prevent this situation from occurring.

First, Mr. Beimel could see the better of his actions and resign period, thus resolving the matter once and for all.

Assuming that Mr. Beimel rejects that alternative, the two remaining Commissioners, Francis Kuntz and George Lavella, could petition the court to 'recoup' his salary once he has accepted employment elsewhere. This would necessitate testifying that Mr. Beimel was no longer actively engaged in conducting the business of Elk although receiving compensation as a Commissioner.

Last, but not least, a class action suit could be brought by the taxpayers of this County demanding relief from paying the salary of an individual who obviously was not doing the job for which he or she was elected to do.

Representative Wachob further stated that he will shortly introduce legislation to put an end to

1. The publication repeats verbatim the prior commentary commencing on the third page thereof with Wachob stating again and repeating "Wachob confirmed that the County Code fails to spell out the duties of elected officials" etc.

such 'shenanigans' in local government. He stated that it is possible that such a bill could be passed as early as September when the House returns from its summer vacation.

We do not begrudge anyone their rightful due. As long as Mr. Beimel or anyone else remains on the job, they are entitled to draw their pay.

However, we draw the line at the thought of paying nearly $1200.00 a month to an individual who is gainfully employed half a nation away.

Perhaps, Mr. Beimel is doing all of us a favor. Regardless of the outcome of this present situation, steps can now be taken to prevent this from ever occurring in the future.

There are many legal loopholes in our system of government and it is about time we started closing some of them. This is an excellent place to begin."

The publication was prompted by the fact plaintiff from January, 1976 until July 31, 1979 was a Commissioner for Elk County and had written a letter of resignation to the President Judge of Elk County, the Honorable Paul Greiner, that plaintiff was resigning, effective July 31, 1979 to assume another position on August 1, 1979 with the Idaho Association of Counties.[2] This letter is attached to the complaint as "EXHIBIT A" and provides:

"Hon. Paul B. Greiner, President Judge
July 9, 1979
Judge's Chambers
Elk County Court House
Ridgway, Pa. 15853
Dear Judge Greiner:
This letter is to formally notify you that I must

---

2. There is nothing in the record nor does counsel argue defendants were aware of this letter.

and do hereby resign as a Commissioner of the County of Elk, Pennsylvania, Effective July 31, 1979, and request that you promptly appoint my successor so that the new Commissioner will have as much time as possible to familiarize himself or herself with the Office, and I will work with your appointee between the date of appointment and the date of my leaving.

So that you will act upon my resignation, I do wish to advise you that I was offered an employment contract by the Idaho State Association of County Officials effective August 1, 1979, and under the terms of that contract I can have no other employment and can hold no other Public Office except as specifically authorized by my employer, and my employer would not and will not authorize me to continue as an Elk County Commissioner. This offer of employment was made July 5, 1979 and was accepted by me on July 5, 1979.

I wish to sincerely thank you for all you have done for me and for the County of Elk since I took office in January, 1976.

> Very truly yours,
> s/Ronald T. Beimel
> Ronald T. Beimel."

On the same date of July 9, 1979 plaintiff attended a commission meeting and resigned his chairmanship of the commissioners (as distinguished from his resignation as a commissioner).

On July 18, 1979 according to the complaint defendants intentionally and unjustifiably caused "EXHIBIT B" to be published in the Ridgway Record, a newspaper owned by The Ridgway Publishing Company. Plaintiff complains the article is a libel to his good reputation and character intending to picture him involved in highly unethical conduct

and the publication was done when defendants knew or had reason to know the publications were false but were published nonetheless with malice or, in the alternative, was done in reckless disregard for the truth or falsity thereof. Plaintiff complains there was dissemination of the publication to the public readers in the community and held plaintiff in contempt and ridicule and made false accusations against him of violating public trust and undergoing unethical conduct all to his injury and good reputation.

Defendant generally denied the complaint but did admit defendant, The Ridgway Publishing Company, operates the Ridgway Record. Defendant filed new matter raising a defense of privilege and fair comment on matters of public interest and concern as well as constitutional freedom of speech and denied the publications were written or published based upon any malice but on the contrary in good faith with the proper motive and the belief that the facts were true and without any reason to doubt their truth. The new matter was joined by an answer generally denying the advanced defense in that the publications were not privileged, were not fair, reasonable or justified and on the contrary were done with malice and without good faith.

The depositions of plaintiff and defendant, William R. Peterson, were taken which we have reviewed.

Attached to the complaint are Exhibits "C" and "K" which plaintiff advances as a background for the on-going and continuous turmoil among the commissioners with charges and counter-charges all to the detriment of the public. These "editorials" were published in the Ridgway Record commencing on Monday, January 19, 1976, February 24,

1977, February 25, 1977, June 20, 1978, December 28, 1978, April 9, 1979 and July 11, 1979. The tenor of the articles is the Commissioners are not acting maturely and in the best interest of the residents of Elk County but rather are involved in minor political disputes and personal animosities and accusations. We cite for example the article of February 25, 1977 under the heading of "OUR OPINION":

". . . At this point in time we could care less about their personal animosities, but we are distressed with the fact that these men would dare put their personal interests above the good of the county.

It is disgusting for all of us to watch the weekly antics of these three men dedicated to the proposition of character assassination. At the same time, we must admit to the possibility that much of what they say about each other is true.

One year is enough, twelve months of listening to their childish inuendos has convinced us that the majority of electors made a tragic mistake in the last election. However, that is so much water over the dam at this point.

To Messrs. Kestler, Beimel and Kuntz we have this to say. Stop your political nit-picking now and do the job for which the people of this county elected you. If you cannot be honest with yourselves, at least be honest with those who elected you to office.

If you cannot do that much, do us all a favor and resign."

Exhibit "F" is a letter to Mr. Bill Peterson as editor of the Ridgway Record from the commissioners under date of March 9, 1978 reference of which is herein made to the commissioners' response to an article in the newspaper under date of March 7, and

a reference to a Mr. Fabiano, a reporter of the Ridgway Record:

"When the Chairman of the Board of Commissioners questioned your reporter, Mr. Fabiano, as to the use of the startling headline for the article which appeared in the newspaper March 7, his reply was, 'This sells newspapers and the word "threatened" would lead the readers to read the article below.' Perhaps we have been mistakenly laboring under a misconception of what the first function of a newspaper is, but we would hope that it would be to truthfully inform the public on matters of general concern."

Another example is found in Exhibit "J" under title "Eviction Time":

"It was apparent from the beginning that the three Commissioners had no intention of operating in the best interest of citizens of this county. Internal bickering, backstabbing and petty squabbles were the rule, rather than the exception, and confidence in our county government dwindled with each passing day."

Another reference is to Exhibit "K" titled "Those Pay Raises" wherein it was observed:

"The court saw differently (in reference to pay raises) and we assume that all the county officials have exhausted their appeals. On the other hand, we have learned to assume nothing when it comes to the courts and politicians."

Many cases have addressed the issue before us, some more recent than others and which both counsel point to support their positions: Curran v. Philadelphia Newspapers, Inc., 261 Pa. Superior Ct. 118, 395 A. 2d 1342 (1978); New York Times Co.

v. Sullivan, 376 U.S. 254, 84 S. Ct. 710, 11 L.Ed. 2d 686 (1964); St. Amant v. Thompson, 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed. 2d 262 (1968); and Brophy v. Philadelphia Newspapers Inc., _____ Pa. Superior Ct. _____, 422 A. 2d 625 (1980).

These cases and the cases cited therein set the framework in which the court must work in resolving a motion for a summary judgment. See Cosgrove Studio & Camera Shop, Inc. v. Pane, 408 Pa. 314, 317, 182 A. 2d 751 (1962):

"A libel is a maliciously written or printed publication which tends to blacken a person's reputation or expose him to public hatred, contempt, or ridicule or injure him in his business or profession."

In considering summary judgment the court must first determine if the statement is capable of a defamatory meaning, if so it is for the jury to decide and not to be withdrawn from the factfinders as a matter of law: Corabi v. Curtis Publishing Company, 441 Pa. 432, 273 A. 2d 899 (1971), wherein the court observed, at p. 447, quoting Boyer v. Pitt Pub. Co., 324 Pa. 154, 188 Atl. 203 (1936):

"'The test is the effect the article is fairly calculated to produce, the impression it would naturally engender, in the minds of the average persons among whom it is intended to circulate. The words must be given by judges and juries the same signification that other people are likely to attribute to them.'"

Plaintiff has the burden to prove "with convincing clarity" the defamatory statements assigned to him were made with either actual malice, that is, with knowledge, the statements were false or with reckless disregard of whether or not they were false: New York Times Co. v. Sullivan, supra.

In Curtis Publishing Company v. Butts, 388 U.S. 130, 155, 87 S.Ct. 1975, 18 L.Ed. 2d 1094 (1967), the court defined malice as being "an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers."

Reckless disregard of the falsity of a statement was defined in St. Amant v. Thompson, supra, at p. 731, as:

"[R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." In short, 'a showing of no more than negligence, carelessness, bad judgment or inaccuracy in the preparation and publication of an allegedly defamatory newspaper article is constitutionally insufficient to show the recklessness needed to prove actual malice."

Indeed, mere failure to investigate is not sufficient to show actual malice, St. Amant v. Thompson, supra, which also held, however, at p. 732:

"The defendant in a defamation action brought by a public official cannot, however, automatically insure a favorable verdict by testifying that he published with a belief that the statements were true. The finder of fact must determine the publication was indeed made in good faith. Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call. Nor

will they be likely to prevail when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation. Likewise, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports."

Finally, in making the foregoing determinations the court when considering motion for summary judgment must deny it if "viewing the evidence and all inferences arising therefrom in the-light most favorable to plaintiff, there appears a genuine issue of fact from which a jury could reasonably find actual malice with convincing clarity." Brophy v. Philadelphia Newspapers Inc., _____ Pa. Superior Ct. at _____, 422 A. 2d at 632.

In the instant case defendants initially argue "Exhibit B" is not defamatory to plaintiff at a time when he was acting as Commissioner of Elk County.[3] Defendants urge us to find what defendant ostensibly was contemplating, to wit, taking another job in Idaho and receive his pay as Commissioner is no more than making a statement the rich pay no taxes. We disagree. In our judgment the minds of the average person reading Exhibit "B" would fairly conclude plaintiff had committed or was about to commit a corrupt act in that, although it was "book legal" it was a despicable and unacceptable act by any community standard and which would or tend to ostracize plaintiff from the community and communications with his fellow man in that his name and reputation would be subject to public hatred, contempt and ridicule. The article explicitly places plaintiff in the same society of the Watergate and Shapp personnel who were prose-

---

3. The parties agree the other publications are not libelous.

cuted for criminal activity. Plaintiff is held up as a schemer: "What is not public knowledge, however, is that Mr. Beimel has not resigned his office as a member of the three-man Board of Commissioners. Conceivably, he can continue to receive his salary as a County Commissioner even though is employed by the State of Idaho."

Defendants would escape the consequence of the article by hedging words such as "conceivably" and "apparently." Nonetheless, the essence of the article unequivocally leaves the impact upon the mind plaintiff fully intends to leave the county still retaining his position as a commissioner paid by the county taxpayers when in fact he will be employed by the State of Idaho receiving a second salary. "Legal . . . perhaps, but highly unethical and a slap in the face to county taxpayers." Clearly this holds plaintiff to public hatred as a scoundrel and through a legal loophole is bilking the county taxpayers of their moneys. We therefore hold the article is defamatory.

Next, reading all of the record, the depositions and articles we cannot conclude the article was written with malice per se. Indeed, plaintiff does not so argue. We find no intenational ill will or any scheme hatched by an evil mind. However, viewing the entire record in the light most favorable to the non-moving party we equally cannot find as a matter of law there is no genuine issue of fact from which a jury could reasonably find actual malice with convincing clarity. We state this in the light of the language of New York Times Company v. Sullivan, supra, stating, at p. 270:

"Thus we consider this case against the background of a profound national commitment to the

principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." (Citations omitted.)

Sullivan, supra, found ample room for negligence and error without defamation all under the First Amendment safeguard of free speech and that debate must be protected. The court equally stated, however, at p. 279:

"The constitutional guarantees require, we think, a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false *or with reckless disregard of whether it was false or not.*" (Emphasis supplied.)

The court concluded this was a fair and equal ruling because public officials are protected when they are sued for libel by a private citizen provided they are acting "within the outer perimeter" of their duties.

The question now becomes if defendants acted or if the factfinders could infer that they acted with reckless disregard of the truth of Exhibit "B." In this determination we make reference to the deposition of defendant, William R. Peterson, taken on October 31, 1980. Mr. Peterson acknowledged he did not attend the commissioners' meeting of July 9, 1979 when plaintiff resigned as chairman, however, another reporter did attend that meeting, Mr. Tom Roof (T-19). He was advised by Mr. Roof that plaintiff resigned as chairman and within a day or

two thereafter he attempted to call Mr. Beimel at the court house and could not reach him. The seed for the article was planted when he received an anonymous phone call from a female advising him plaintiff had not resigned his position as a commissioner but only as chairman "and he was going to stay on and probably collect his money while having another job." (T-20). Thereafter he attempted to call plaintiff as he stated on a couple occasions and could not reach him but he did call Mr. Frank Kuntz who was acting as chairman who confirmed plaintiff had resigned as chairman and did not resign as commissioner. Thereafter he called his State Representative, Mr. Wachob, and had him check the County Code as to the legality of Mr. Beimel's proposed action. Between July 9, 1979 and July 18, 1979, the latter being the date of the article, he did not talk to plaintiff and he did not have any contact with the President Judge concerning the resignation. He admitted he did not know the procedure for a commissioner to resign. Defendant stated he had no doubt plaintiff had not resigned as a commissioner "that he was still going to remain in office. I believed that." (T-26). And finally there was no doubt in his mind plaintiff was going to collect two salaries.

We are compelled to view these statements, indeed the entire record, not on the basis of negligence or carelessness as the legal community defines those terms but at a higher standard of responsible conduct the breach of which will impose liability. Recklessness is generally defined as rashness, heedlessness and although the act is done voluntarily it is done with abandonment of any care and heedlessness and heedless indifference to the results or consequences which may follow. It is

generally an accepted definition of reckless conduct as lacking the element of intent to do wrong but acting with indifference to the rights of others: Black's Law Dictionary (4th ed.).

Mr. Peterson had the Commissioner minutes of July 9, 1979 (T-18) which addresses the resignation time table of plaintiff as appearing in plaintiff's deposition (T-16):

"I, (Plaintiff) stated that I would be . . . accepting a position of employment in another area and resign as Chairman of the Elk County Commissioners, . . . and I felt . . . that it needs more time than . . . will be able to give as Chairman, and I nominated Mr. Kuntz as the Chairman *Mr. Levella asked if Mr. Beimel will be here until the end of 1979. Mr. Beimel said he doesn't know and can't tell yet.*" (Emphasis supplied.)

Mr. Peterson's prior frustration and anger over the conduct of the Commissioners as exhibited in prior editorials coupled with the anonymous phone tip caused him to lash out as is portrayed in Exhibit "B." The record does not disclose if plaintiff was in the community when defendant decided to write the article on July 16, however, there is nothing in the record that would indicate to the contrary.

In Curran v. Philadelphia Newspapers, Inc., supra, the court, in following St. Amant v. Thompson, supra, said, at p. 126: "'Reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.'"

In our opinion it is for the jury to determine Mr. Peterson's state of mind at the time he composed Exhibit "B" considering the prior publications which conclude a pre-disposed negative attitude towards, not only plaintiff, but the commission body. We believe it is reasonable to conclude little if any serious thought was given to the truth of the publication. The anonymous phone tip fits perfectly with defendant's prior concept of commissioner conduct and ergo the publication.

We recognize, as Curran, supra, makes it clear in a libelous action the First Amendment is involved and therefore summary judgment disposition is not within the orbit of a normal case in that the publication is generally protected by immunity and summary judgment is preferred not being defeated by the general disposition that malice presents a jury question. However, in Washington Post Company v. Keogh, 365 F. 2d 965, 967 (D.C. Cir. 1966), the court makes it clear:

"That state of mind should generally be a jury issue does not mean it should always be so in all context, especially where the issue is recklessness, which is ordinarily inferred from objective facts. Summary judgment serves important functions which would be left undone if courts too restrictively viewed their power."

We are compelled to make the threshold inquiry into actual malice and, as stated, we have concluded defendants did not act with an evil mind with knowledge of the falsity of their publication, however, on balance, we conclude there is a genuine issue of fact of whether or not the publication was made in good faith as pronounced in St. Amant v. Thompson, supra. There it is held in a libelous suit defendant cannot "automatically in-

sure a favorable verdict by testifying that he published with a belief that the statements were true."

For these reasons we enter the following

## ORDER

And now, April 28, 1981, the motion for summary judgment is denied.