395 A.2d 1342

Robert E. J. CURRAN, Appellant,

v.

PHILADELPHIA NEWSPAPERS, INC., a/k/a the
Philadelphia Inquirer.

Robert E. J. CURRAN, Appellant,

v.

PHILADELPHIA NEWSPAPERS, INC., d/b/a the Philadelphia
Inquirer, a Philadelphia Corporation.

Superior Court of Pennsylvania.

Argued March 29, 1978.

Decided Dec. 19, 1978.

Garland D. Cherry, Media, for appellant.

David H. Marion, Philadelphia, for appellee.

Before JACOBS, President Judge, and HOFFMAN, CER-CONE, PRICE, VAN der VOORT, SPAETH and HESTER, JJ.

PER CURIAM:

The six Judges who decided this appeal being equally divided the judgment is affirmed.

SPAETH, J., files an opinion in support of affirmance in which VAN der VOORT, J., joins.

CERCONE, J., concurs in the result in the opinion by SPAETH, J.

HESTER, J., files an opinion in support of reversal in which JACOBS, President Judge, and PRICE, J., join.

HOFFMAN, J., did not participate in the consideration or decision of this case.

## OPINION IN SUPPORT OF AFFIRMANCE

SPAETH, Judge:

Each of these two appeals, which have been consolidated, is from a summary judgment in favor of appellee, Philadelphia Newspapers, Inc., publisher of the Philadelphia Inquirer. Each action is in libel and is brought by appellant, a former United States Attorney for the Eastern District of

Pennsylvania. The question presented is whether a jury should have been permitted to decide whether the statements at issue were published with malice. We shall discuss the two cases separately.

## I. Appeal No. 1475

In August, 1972, appellant was appointed United States Attorney, his term to expire in August, 1976. On Wednesday, March 31, 1976, appellant announced his resignation, effective April 30, 1976. In his affidavit incident to the motion for summary judgment appellant says that his decision to resign and return to private practice had been made some time before March 31.

As it happened, appellant had scheduled a meeting in Washington, D. C., for the evening of March 31 on business of the Attorney General's Advisory Committee, to which appellant had been appointed. Since he was to be in Washington for this meeting, appellant had also scheduled a meeting for the next day, April 1, at which he, three assistants, and Deputy Attorney General Harold Tyler were to discuss a criminal investigation. In accordance with this schedule, appellant, after announcing his resignation, departed for Washington, leaving his First Assistant, J. Clayton Undercofler, III, in charge.

On receiving word of appellant's resignation, Anthony Lame, a reporter for the Inquirer, telephoned James Seif, a Special Assistant under Deputy Attorney General Tyler. Upon being told by Lame that appellant had resigned, Seif replied: "It's a good thing he did, because they would have thrown his ass out of here if he hadn't." Lame says in his affidavit that Seif specified that appellant's resignation would have been demanded at the April 1 meeting, although Seif in his affidavit says no mention was made of the April 1 meeting. Lame also says in his affidavit that Seif's statement was consistent with information the Inquirer had previously received from reliable sources that the Justice Department was unhappy with appellant's performance of his duties, and that Tyler had been close to firing appellant

before. Seif was in a position to know about personnel conflicts between the Department and the United States Attorneys; Lame considered him a reliable source, and had consulted him before on other matters.

Lame relayed this information to Janice Schaffer, another Inquirer reporter who was writing the story on appellant's resignation. She telephoned two other sources, who confirmed that the Justice Department was indeed seeking to replace appellant. She then spoke with Undercofler. Undercofler told her that the Washington meeting with Tyler had been scheduled for weeks and involved office matters, and that appellant's decision to resign was for personal reasons and not because of a potential firing. Later that day Undercofler again spoke with Schaffer and urged her to call William B. Gray, director of the executive office for United States Attorneys; Undercofler said that Gray would confirm that appellant was not going to be fired and that the meeting with Tyler concerned routine matters.

Schaffer reached appellant by telephone at the Wilmington, Delaware, train station. Appellant said that the Washington meeting was routine, and denied that he had resigned in order to avoid being fired. Schaffer also telephoned Gray; he did confirm that appellant had scheduled the meeting of April 1, but when asked whether the Justice Department was satisfied with appellant's performance, or whether Tyler had intended to ask for appellant's resignation, he refused to comment.

As a result of this activity, on April 1, which was a Thursday, the Inquirer ran a news story about appellant's resignation; the story included the following paragraphs:

Other federal sources, however, said that if Curran had not resigned, he would have been asked to resign at a meeting he had scheduled today with Harold Tyler, deputy attorney general with the Justice Department.

Curran described that report as "ridiculous" and added that he had requested the meeting to discuss office business. Tyler could not be reached for comment. His assistant, William Gray, declined to comment.

During the day Tyler's office notified the Inquirer that not Tyler but appellant had requested the meeting with Tyler, and that Tyler had not planned to ask for appellant's resignation or to fire him. A news story reporting this was printed the next day, April 2.

On Sunday, April 4, another reference to appellant's resignation appeared in the Inquirer's column "In Passing," which was a review of the week's news. The column told of appellant's resignation, and added:

> Curran said that his resignation was entirely voluntary and that, in any case, he had planned to resign at the end of his term in August. Federal sources, however, said that the Justice Department was unhappy with Curran and was about to ask him to resign.

There was no reference in the column to Tyler's denial that he had planned to ask appellant to resign.

Appellant's complaint charges that both the first paragraph of the April 1 news story—that if he had not resigned, he would have been asked to—and the item just quoted from "In Passing" were defamatory and published maliciously. By its motion for summary judgment appellee contended that there was no evidence of malice. The lower court agreed.

–A–

The requirement that malice must be proved was established by *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). There the Supreme Court held:

> The constitutional guarantees [of freedom of speech and press] require . . . a federal rule that prohibits a public official [1] from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with "actual malice" —that is, with knowledge that it was false or with reckless disregard of whether it was false or not.

1. Appellant concedes that he is a public figure.

*Id.,* at 279–80, 84 S.Ct. at 726.

This protection extends to false statements of fact, *id.,* at 271–72, 84 S.Ct. 710, as well as comment or opinion, and malice must be proved with "convincing clarity," *id.,* at 285–86, 84 S.Ct. 710.

 In later cases the Court elaborated on its definition of malice. Malice was found where there was "an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers." *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 158, 87 S.Ct. 1975, 1993, 18 L.Ed.2d 1094 (1967). However, ill will and a desire to do harm are not alone sufficient to show malice. *Henry v. Collins,* 380 U.S. 356, 85 S.Ct. 992, 13 L.Ed.2d 892 (1965). In *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968), the Court said:

> Reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.

–B–

In the normal case we are wary of summary judgment:

> [W]e are to accept as true all well pleaded facts in the nonmoving parties' pleadings, as well as the admissions on file, giving to them the benefit of all reasonable inferences to be drawn therefrom; the record must be examined in the light most favorable to them; and in passing upon a motion for summary judgment, it is no part of our function to decide issues of fact but solely to determine whether there is an issue of fact to be tried and all doubts as to the existence of a genuine issue as to a material fact must be resolved against the party moving for summary judgment.

*Ritmanich v. Jonnel Enterprises, Inc.,* 219 Pa.Super. 198, 203, 280 A.2d 570, 573 (1971).

However, this is not the normal case, for it involves the first amendment; in such a case, summary judgment is a preferred procedure.[1a] In *Washington Post Co. v. Keogh,* 125

[1a.] The opinion in support of reversal correctly notes that the *trial court* in *Gertz v. Welch,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), stated:

> "When there is a factual dispute as to the existence of actual malice, summary judgment is improper . . ."

Dissenting slip opinion at 1358.

The United States Supreme Court quoted these and other words from the trial court's memorandum opinion, as part of the history of the case to explain the theory on which the case had been tried. 418 U.S. at 329 n. 2, 94 S.Ct. 2997. It must be noted, however, that at no point did the Supreme Court adopt the trial court's statement as its own.

The issue in *Gertz* was whether the rule of *New York Times Co. v. Sullivan, supra,* should be applied where an attorney who was not a public official or public figure had sued a magazine publisher for defamatory statements that concerned an issue of public or general interest. Thus *Gertz* is not in point, so far as the present case is concerned. It is, nevertheless, supportive of the decision we reach, for in the course of its opinion the Supreme Court emphasized the importance of a vigorous and uninhibited press. The Court stated:

> Some tension necessarily exists between the need for a vigorous and uninhibited press and the legitimate interest in redressing wrongful injury. As Mr. Justice Harlan stated, "some antithesis between freedom of speech and press and libel actions persists, for libel remains premised on the content of speech and limits the freedom of the publisher to express certain sentiments, at least without guaranteeing legal proof of their substantial accuracy." *Curtis Publishing Co. v. Butts,* supra, at 152, 18 L.Ed.2d 1094, 87 S.Ct. 1975. In our continuing effort to define the proper accommodation between these competing concerns, we have been especially anxious to assure to the freedoms of speech and press that "breathing space" essential to their fruitful exercise. *NAACP v. Button,* 371 U.S. 415, 433, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963). To that end this Court has extended a measure of strategic protection to defamatory falsehood.

> The New York Times standard defines the level of constitutional protection appropriate to the context of defamation of a public person. Those who, by reason of the notoriety of their achievements or the vigor and success with which they seek the public's attention, are properly classed as public figures and those who hold governmental office may recover for injury to reputation only on clear and convincing proof that the defamatory falsehood was made with knowledge of its falsity or with reckless disregard for the truth. This standard administers an extremely powerful antidote to the inducement to media self-censorship of the common-law rule of strict liability for libel and slander. And it exacts a correspondingly high price from the victims of defamatory falsehood. Plainly many deserving plaintiffs, including some intention-

U.S.App.D.C. 32, 365 F.2d 965 (1966), *cert. denied,* 385 U.S. 1011, 87 S.Ct. 708, 17 L.Ed.2d 548 (1967), the court said:

> In the First Amendment area, summary procedures are even more essential. For the stake herein, if harassment succeeds, is free debate. . . . Unless persons, including newspapers, desiring to exercise their First Amendment rights are assured freedom from the harassment of lawsuits, they will tend to become self-censors. And to this extent debate on public issues . . . will become less uninhibited, less robust, and less wide-open, for self-censorship affecting the whole public is 'hardly less virulent for being privately administered.' *Smith v. People of State of California,* 361 U.S. 147, 154, 80 S.Ct. 215, 219, 4 L.Ed.2d 205 (1959).

*Id.,* 125 U.S.App.D.C. at 35, 356 F.2d at 968.

Similarly, in *Bon Air Hotel, Inc., v. Time, Inc.,* 426 F.2d 858 (5th Cir. 1970), the court said:

> Thus it is clear that, where a publication is protected by the *New York Times* immunity rule summary judgment, rather than trial on the merits, is a proper vehicle for affording constitutional protection in the proper case. *Id.,* at 864–65.

This preference for summary judgment is not defeated by the principle that generally an allegation of malice presents a jury question. Thus in *Washington Post Co. v. Keogh, supra,* 125 U.S.App.D.C. at 34–35, 365 F.2d at 967–68, the court said:

> That state of mind should generally be a jury issue does not mean it should always be so in all contexts, especially where the issue is recklessness, which is ordinarily inferred from objective facts. Summary judgment serves

ally subjected to injury, will be unable to surmount the barrier of the New York Times test. Despite this substantial abridgment of the state law right to compensation for wrongful hurt to one's reputation, the Court has concluded that the protection of the New York Times privilege should be available to publishers and broadcasters of defamatory falsehood concerning public officials and public figures. *New York Times Co. v. Sullivan, supra; Curtis Publishing Co. v. Butts, supra.*
418 U.S. at 342–43, 94 S.Ct. at 3008.

important functions which would be left undone if courts too restrictively viewed their power. (Footnote omitted.) In *Rosenblatt v. Baer,* 383 U.S. 75, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966), the Supreme Court considered a case tried before *New York Times Co. v. Sullivan.* Remanding for retrial because "the record suggests respondent may be able to present a jury question of malice as there defined," 383 U.S. at 87, 86 S.Ct. at 677, the Court said that "*it is for the trial judge in the first instance* to determine whether the proofs show respondent to be a 'public official,' " 383 U.S. at 88, 86 S.Ct. at 677 (emphasis supplied). In a footnote, the court added:

Such a course will both lessen the possibility that a jury will use the cloak of a general verdict to punish unpopular ideas or speakers, and assure an appellate court the records and findings required for review of constitutional decisions.

*Id.,* at 88 n. 15, 86 S.Ct. at 677.

These considerations are equally applicable where the determination to be made is whether the proofs show malice. Thus in *Wasserman v. Time, Inc.,* 138 U.S.App.D.C. 7, 9, 424 F.2d 920 (1970), Judge WRIGHT said:

In my judgment *New York Times Co. v. Sullivan* makes actual malice a constitutional issue to be decided in the first instance by the trial judge applying the *Times* test of actual knowledge or reckless disregard of the truth. *Id.,* at 922 (WRIGHT, J., concurring) (footnote omitted).

 Applying these principles here, we conclude as follows: When a public official sues a newspaper for defamation, the court must on a motion for summary judgment make a threshold inquiry into actual malice: Unless the court finds on the basis of pretrial affidavits, depositions, and documentary evidence that the plaintiff can prove actual malice in the *New York Times* sense, it should grant summary judgment for the defendant. *Bon Air Hotel, Inc. v. Times, Inc., supra; Wasserman v. Time, Inc., supra* (WRIGHT, J., concurring). It is not enough for the plaintiff, in resisting summary judgment, to argue that there is a

jury question as to malice; he must make a showing of facts from which malice may be inferred. *Thompson v. Evening Star Newspaper Co.,* 129 U.S.App.D.C. 299, 394 F.2d 774 (1968). *Accord, Oliver v. Village Voice, Inc.,* 417 F.Supp. 235 (S.D.N.Y.1976), *Meeropol v. Nizer,* 381 F.Supp. 29 (S.D.N.Y. 1974). *See also Bandelin v. Pietsch,* 563 P.2d 395 (Idaho, 1977), *cert. denied,* 434 U.S. 891, 98 S.Ct. 260, 54 L.Ed.2d 177 (1977). Such an inference must be clear. *Cf. New York Times Co. v. Sullivan, supra.*

It is important not to overstate this preference for summary judgment; it must be exercised in a manner consistent with *St. Amant v. Thompson, supra.* In that case the Court spoke of the circumstances in which a jury determine is appropriate:

> The defendant in a defamation action brought by a public official cannot, however, automatically insure a favorable verdict by testifying that he published with a belief that the statements were true. The finder of fact must determine whether the publication was indeed made in good faith. Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call. Nor will they be likely to prevail when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation. Likewise, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports.

390 U.S. at 732, 88 S.Ct. at 1326 (footnote omitted). At first reading, it might appear that this statement is in conflict with the cases we have just discussed, which emphasize the preference for summary judgment. However, as we shall discuss below, we believe that the cases are consistent.

–C–

Appellant argues that a jury could infer malice from: (1) the fact that appellee "manufactured a falsehood" in saying

that federal sources said Tyler intended to fire appellant at the April 1 meeting; (2) the publication of the statement regarding Tyler despite the fact that both appellant and his assistant, Undercofler, had told appellee's reporter that it was erroneous; and (3) the republication of the statement in "In Passing" after Tyler's office had told appellee that it was erroneous.

To the extent that appellant contends, as he did in his complaint, that there was no federal source for the report that Tyler intended to fire him, appellant appears to be in error, and to have conceded his error. At a deposition arranged by appellant, Seif was unequivocally identified as such a source, and as to this no material issue of fact can be said to remain. However, appellant has adopted a more specific argument, namely, that there was no federal source for the report *that the firing was going to take place at the April 1 meeting.* Assuming that Seif's version is true—that no mention was made of the April 1 meeting in his conversation with reporter Lame—it would appear to be true that there was no such source. It does not follow, however, that because there was no such source, there was a manufactured falsehood from which malice may be inferred.

Initially, we note that the gist of appellant's claim appears to lie in the statement that he was about to be fired. If the stories in the Inquirer had said only that, we should hold that under the circumstances appellee could not be liable because it had a right to rely on its source. *See infra.* That being so, we do not see how the added statement of when the firing would occur should make a difference, for that added statement, in and of itself, was not defamatory.

In addition, even if we assume that the added statement was, in and of itself, defamatory, still we must make a threshold inquiry into actual malice. It is at this point that we must closely examine *St. Amant v. Thompson, supra,* where the Court considered when an appropriate jury question would be presented.

Strictly speaking, any falsehood is "fabricated . . . the product of [the author's] imagination." *St. Amant v. Thompson, supra* at 732, 88 S.Ct. at 1326. However, the Court cannot be understood to have been speaking so broadly in *St. Amant,* for it confirmed its prior holdings that "to insure the ascertainment and publication of the truth about public affairs, it is essential that the First Amendment protect some erroneous publications as well as true ones." 390 U.S. at 732, 88 S.Ct. at 1326. Thus it is clear that when it spoke of fabrications, the Court had something in mind other than falsehood *per se.* In deciding what the Court did have in mind, it is helpful to consider two other cases, where the Court specifically dealt with fabrications, which it said were appropriately submitted to a jury on the question of malice.

In *Time, Inc. v. Hill,* 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967), the publisher of Life Magazine was sued for printing an article falsely reporting that a new play portrayed an experience suffered by the plaintiff and his family. Members of the family had at one time been held hostage by convicts, but they were released unharmed; later they stressed to newsmen that the convicts had been courteous, had not molested them, and had not been violent. The magazine article called the play a "re-enactment" of the incident, showed photographs of the family's house, and specifically identified the Hill family by name as the victims. As described in the article, however, the incident was marked with violence and the family had been harassed. The plaintiff brought an action for invasion of privacy, rather than libel. The Court nonetheless applied the *New York Times* requirement of proof of knowing or reckless falsehood, and said,

> [w]here either result [—knowing or reckless falsehood, or innocent misstatement—] finds reasonable support in the record, it is for the jury, not for this Court, to determine whether there was knowing or reckless falsehood.

*Time, Inc. v. Hill,* 385 U.S. at 394 n. 11, 87 S.Ct. at 545.

Several facts supported the Court's finding that given such falsehood, a jury could properly find malice. One was the fact that the author of the article had in his file news clippings revealing that the actual incident had been non-violent, and that the book—the source of the play—was based on various other incidents as well as the one involving the Hill family. Furthermore, the first draft of the article had acknowledged that the play was "somewhat fictionalized", and had made almost no mention of the Hill family; but in the final draft the word "re-enactment" was used, references to the Hill family were inserted in the first sentence, and the words "somewhat fictionalized" were deleted.

In *Cantrell v. Forest City Publishing Co.*, 419 U.S. 245, 95 S.Ct. 465, 42 L.Ed.2d 419 (1974), the newspaper article at issue involved a "follow-up" visit to a family whose husband/father had been killed in a local disaster. The Court found that a jury could appropriately find malice where the article created at least one egregiously false impression: that the widow was at home and talked to the reporter (who found that she "wears the same mask of non-expression she wore at the funeral." 419 U.S. at 248, 95 S.Ct. at 468). In fact, the widow was not at home, and the reporter had no contact with her.

■ It is clear that in these two cases there was much more evidence of knowing and reckless falsehood, and therefore of malice, than has been proffered here. In both cases, the defendant's statements were made in the face of objective evidence to the contrary, in the one case, contrary to the writer's statement that the Hill family's experience had been violent, in the other, contrary to the inference that the Cantrell widow had talked to a reporter. These false statements, moreover, were the "backbone" of the respective articles.[2] Here, the most that can be said is that appellee's

2. At this point a decision by our Supreme Court, *Corabi v. Curtis Publishing Co.*, 441 Pa. 432, 273 A.2d 899 (1971), is instructive. There the Court affirmed the lower court's denial of judgment n. o. v., sought by Curtis. Finding ample evidence of malice in the

reporter leaped to a conclusion.[3] Specifically: given the information that appellant's firing was imminent, and that appellant had resigned one day before a meeting with the man who had authority to fire him, the reporter concluded that but for the resignation the firing would have occurred at the meeting. This is not enough to sustain a finding of malice, for it does not amount to "reasonable support in the record," *Time, Inc. v. Hill, supra,* 385 U.S. at 394 n. 11, 87 S.Ct. 534, for a finding of knowing or reckless falsehood. Accordingly, no jury question is presented, and the preference we must show for summary judgment has not been overcome.

Appellant insists that it was reckless of appellee to run the stories in face of the statements by Undercofler first, and then by appellant and Gray, and later by Tyler.[4] However, the events of recent years show that only a limited effect may be given to official denials of this sort. It would have changed the course of this country's history considerably—and, we venture to say, not for the better—if, by the simple action of denying a newspaper report, a Watergate figure had been able to force this choice upon the paper: either to withdraw the report, or to continue to print it under the threat that no matter how trustworthy and well informed its sources had been, the newspaper would be

article's repeated implication that the plaintiff, Lillian Reis Corabi, was involved in assault and murder, the Court said that Curtis "condoned and capitalized on this exploitation of the present plaintiff." 441 Pa. at 467, 273 A.2d at 917. Thus, as in *Time, Inc.,* and *Cantrell,* the facts of *Corabi* show a much more compelling case for knowing or reckless falsehood than do the facts here.

3. Appellant states in his brief that he and appellee were on bad terms because he refused to reveal details of secret investigations to the press. However, this appears nowhere in the record. The only hint of animosity appears in Schaffer's affidavit, where it is said that appellant discriminated against appellee by giving other newspapers information he withheld from appellee's reporters. Schaffer affidavit at 8.

4. We note in passing that the fact that appellant himself had scheduled the April 1 meeting, as the various statements confirmed, did not by itself rule out the possibility that Tyler planned to fire appellant at that time.

subject to heavy libel penalties if the report turned out to be false.

In *Martin Marietta Corp. v. Evening Star Newspaper Co.*, 417 F.Supp. 947 (D.C.D.C.1976), the chairman of the board of the plaintiff corporation telephoned the newspaper and denied the truth of an article saying that the corporation had hosted a stag party for Defense Department officials. In affirming a summary judgment for the newspaper, the court said:

> If potential plaintiffs in libel suits could cut off a [no] malice defense simply by calling a newspaper and giving a broad denial of an article, the first amendment policy embodied in *New York Times* would be undermined. *Id.* at 960.

Here, appellant has offered no evidence to support a finding that appellee was reckless in relying on its source, Seif, who was in a position to be informed and who had been reliable in the past. *Compare Curtis Publishing Co. v. Butts, supra* (liability found where source was known to be a convicted felony, not an expert in the crucial area, football; source claimed to have overheard telephone conversation during which football game was "fixed"). As the court noted in *Washington Post Co. v. Keogh, supra,* reliance on a source may not result in liability "in the absence of evidence that the publisher had good reason to suspect falsity." 365 F.2d at 972–73. *See also Martin Marietta Corp. v. Evening Star Newspaper Co., supra.*

Finally, other factors we deem important to the conclusion that there is no reasonable support in the record for a finding of malice may be mentioned: the fact that all denials came from parties presumably interested in appellant or in the confidentiality of Justice Department affairs, *see Martin Marietta Corp. v. Evening Star Newspaper Co., supra;* the absence of disinterested persons to consult who could knowledgeably comment, *compare Curtis Publishing Co. v. Butts, supra* (defendant failed to interview a person named by informant as a witness to crucial telephone call); the "hot news" situation, in which appellee had limited time

in which to investigate, *compare Curtis Publishing Co. v. Butts, supra,* and *Corabi v. Curtis Publishing Co., supra* (liability found where not a "hot news" situation); and the fact that appellee did print all denials as they came in, *compare Airlie Foundation, Inc. v. Evening Star Newspaper Co.,* 337 F.Supp. 421 (D.C.D.C.1972) (liability found where defendant telephoned CIA official and received denial, but printed that there had been no such denial).[5]

## II. Appeal No. 1476

Following his resignation, appellant was replaced by David W. Marston. On Thursday, September 23, 1976, Marston held a press conference in connection with the return of an indictment by a federal grand jury against a prominent politician. Appellee's reporter Schaffer attended the conference. Marston did not mention appellant by name at the conference. However, the next day an article in the Inquirer, which focused on the return of the indictment and in that connection mentioned the press conference, said:

> Marston, who replaced former U.S. Attorney Robert Curran on June 30, also made reference to accusations that Curran did not vigorously pursue white-collar crimes if the suspects were politically well-connected. Both Curran and Marston were appointed by Republican administrations.[6]

5. Appellant charges in his complaint that the failure to reprint Tyler's denial in the "In Passing" column was defamatory. We agree that it would have been fairer to reprint the denial, but note that the denial had been printed in a separate article the previous Friday. Furthermore, in *Miami Herald Publishing Co. v. Tornillo,* 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974) the Supreme Court invalidated a state "right to reply" law, because it intruded into the function of editors. The Court said:

> The choice of material to go into a newspaper, and the decisions made as to limitations on the size and content of the paper, and treatment of public issues and public officials—whether fair or unfair—constitute the exercise of editorial control and judgment. *Id.* at 258, 94 S.Ct. at 2840.

Accordingly, we give wide deference to appellee's editors' choice of what to print in the limited space allotted to the "In Passing" column.

6. The indicted politician was also a Republican.

"There is no place for politics in prosecutions," Marston said of the accusations. "If it's a public corruption case and we can make it, we'll make it."

█ The affidavits submitted by appellee are to the following effect. When Schaffer returned from the press conference, she relayed the news to another reporter, Robert Frump, who was writing the article about the indictment. Among other things, Schaffer said that Marston had said:

"I think people have alleged in other districts and in other times (it's) always other parties that get prosecuted." Schaffer affidavit at 5.

Frump "assumed and understood that by those remarks Mr. Marston was referring specifically to Mr. Curran. This understanding was based upon my knowledge of federal investigators' dissatisfaction with Mr. Curran's pursuit of political corruption cases, and upon reports of similar dissatisfaction within the Department of Justice." Frump affidavit at 3.[7] When Schaffer for the first time read Frump's article that evening, she noticed the incorrect addition of a reference to Curran. As a result, the Inquirer in all its Sunday additions printed an item called "Clearing the Record", which identified the story at issue, repeated what had been said about appellant, admitted this was an error, and confirmed that Marston had made no reference to appellant.

█ Appellant's appeal of the summary judgment in appellee's favor must, of course, be judged by the same standards we have considered in our discussion of his first appeal, *supra*. Again appellant has merely alleged malice.

---

7. Appellant, in his complaint and supporting affidavit, says that the particular investigation Marston referred to was in fact begun during his term of office, and that appellant maliciously failed to include that fact in the article, although it was evident at the time of the news conference. However, the considerations of *Miami Herald Publishing Co. v. Tornillo, supra,* require us to reject this basis of liability. *See* footnote 5, *supra.* Furthermore, even if this fact can be said to contradict the allegation that appellant did not "vigorously pursue" certain prosecutions, it goes to the truth or falsity of the news article, which is not at issue here. Without a finding of malice, falsity is not a ground for liability. *New York Times Co. v. Sullivan, supra.*

This allegation is not enough to defeat the motion for summary judgment, for there is no such evidence as affords reasonable support in the record for a finding of knowing or reckless falsehood. In writing the article Frump was not acting in the face of objective evidence to the contrary, nor was his error the backbone of the article, as in *Time, Inc. v. Hill, supra,* and *Cantrell v. Forest City Publishing Co., supra.* Again, the most that can be said is that appellee's reporter jumped to a conclusion. This does not detract from the defamatory nature of the article; for while the article may be read as only recounting Frump's interpretation of Marston's remarks, it may also reasonably be read as saying that Marston specifically referred to appellant by name. The threshold inquiry we must make, however, is not regarding falsity but malice.

### III.

We recognize that by what we have said we have denied appellant any relief, and we are aware of the drastic nature of our action. We are moved, however, by considerations that we find compelling. They were well stated by Justice STEWART, in his address on November 2, 1974 at the Yale Law School:

Newspapers, television networks, and magazines have sometimes been outrageously abusive, untruthful, arrogant, and hypocritical. But it hardly follows that elimination of a strong and independent press is the way to eliminate abusiveness, untruth, arrogance, or hypocrisy from government itself.

It is quite possible to conceive of the survival of our Republic without an autonomous press. For openness and honesty in government, for an adequate flow of information between the people and their representatives, for a sufficient check on autocracy and despotism, the traditional competition between the three branches of government, supplemented by vigorous political activity, might be enough.

The press could be relegated to the status of a public utility. The guarantee of free speech would presumably put some limitation on the regulation to which the press could be subjected. But if there were no guarantee of a free press, government could convert the communications media into a neutral "market place of ideas." Newspapers and television networks could then be required to promote contemporary government policy or current notions of social justice.[9]

Such a constitution is possible; it might work reasonably well. But it is not the Constitution the Founders wrote. It is not the Constitution that has carried us through nearly two centuries of national life. Perhaps our liberties might survive without an independent established press. But the Founders doubted it, and, in the year 1974, I think we can all be thankful for their doubts. Stewart, *Or of the Press,* 26 Hast.L.J. 631, 636–37 (1974). The orders of the lower court are affirmed.

VAN der VOORT, J., joins in this opinion.

CERCONE, J., concurs in result.

## OPINION IN SUPPORT OF REVERSAL

HESTER, Judge:

I vigorously dissent.

The majority has concluded that the lower court acted appropriately in granting Appellee's Motions for Summary Judgment in accordance with Pa.R.C.P. 1035 in the within libel actions consolidated for the purpose of this appeal. They were instituted by Robert E. J. Curran (Curran), former United States Attorney for the Eastern District of Pennsylvania against Philadelphia Newspapers, Inc. (PNI), publisher of The Philadelphia Inquirer.

The threshold question on appeal is whether there was sufficient evidence of "malice" to submit either or both libel actions to a jury.

The majority feels that there was not; I feel that there definitely was.

Appeal No. 1475

The newspaper articles complained of dealt with the resignation and performance of Curran as the U.S. Attorney for the Eastern District of Pennsylvania. There is no doubt, therefore, that Appellant Curran was a "public official" for purposes of the within litigation. As a public official, the law imposes upon Curran the burden of proving with "convincing clarity" the material facts which would demonstrate that PNI published the statements complained of with "actual malice." He has been denied the opportunity of meeting that burden.

It is agreed that the standards of *New York Times, Inc. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), are applicable and that Appellant is precluded:

". . . from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false *or* with reckless disregard of whether it was false or not." *Id.* 279, 280, 84 S.Ct. 726.

As the majority has accurately stated, in a defamation action brought by a public official, "the finder of fact must determine whether the publication was indeed made in good faith . . ." *St. Amant v. Thompson*, 390 U.S. 727, 732, 88 S.Ct. 1323, 1326, 20 L.Ed.2d 262 (1968), or made with "reckless disregard" as to whether or not it was false.

This qualitative standard was refined in *St. Amant*, supra, at page 731, 88 S.Ct. at page 1325:

"[C]ases are clear that reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard to truth or falsity and demonstrates actual malice."

The majority of this Court has attempted to distinguish the instant appeals with *Time, Inc. v. Hill,* 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967), and *Cantrell v. Forest City Publishing Co.,* 419 U.S. 245, 95 S.Ct. 465, 42 L.Ed.2d 419 (1974), wherein, in both, the issue of the existence of actual malice was submitted to a jury. In so doing, our majority has concluded that in both *Time, Inc.* and *Cantrell* "there was much more evidence of knowing and reckless falsehood and, therefore, of malice, than has been proffered here." Our majority has concluded that based upon the record in both of the instant consolidated appeals, the most that can be said is Appellee's reporter leaped (or jumped) to a conclusion.

I disagree. The record, read most favorably to the Appellant, manifests material factual inconsistencies which go to the core of the question of whether the publications were made in good faith or whether the same were made with "actual malice".

The lower record includes: the deposition of James Seif, Special Assistant to the Assistant Attorney General for the Criminal Division, U.S. Department of Justice; the deposition of Jay C. Waldman, Deputy Assistant Attorney General for the Criminal Division, U.S. Department of Justice; Affidavits of Anthony Lame, Janice Lee Schaffer, John E. Severson and Robert Frump, reporters for PNI; Two Affidavits of Appellant, Robert E. J. Curran; Affidavit of J. Clayton Undercofler, III, First Assistant U.S. Attorney for the Eastern District of Pennsylvania; and Affidavit of Joseph M. Fioravanti, Assistant U.S. Attorney.

Turning first to the April 1, 1976 publication, the record reflects the following: That on March 31, 1976 reporter Schaffer was told by reporter Lame "that a reliable source had stated to him that if (Appellant) had not resigned he would have been asked to resign at a meeting he had scheduled for the following day with Deputy Attorney General Harold Tyler." (Schaffer deposition ¶ 5–T88(a). Schaffer then spoke to Undercofler who:

". . . responded that she couldn't print such a story because it was untrue. I said that the April 1, 1976 meeting with Mr. Tyler had been scheduled by Mr. Curran and that Messrs. Galli and Lieberman and I were also going to attend. I also said that the meeting had been scheduled for several weeks and involved office matters. Again I stated that her information was wrong. I said that Mr. Curran had made a personal decision to resign and was not going to be fired . . . I asked her to please talk with (Appellant) before printing any story because her information was incorrect." (Undercofler deposition ¶ 6–T112(a)–113(a).

That same day Schaffer spoke to Appellant who told her that:

"his resignation was entirely voluntary." ". . . I explained that her source was absolutely wrong and that if she checked with Mr. Tyler she would be so informed . . ." (Appellant's deposition ¶ 6–T116(a).

Thereafter Schaffer again called Undercofler and told him that she was not satisfied with Appellant's explanation, at which time Undercofler requested that Schaffer contact William B. Gray [1] who, in a subsequent telephone conversation, confirmed to Schaffer the fact the *Appellant had scheduled* the April 1, 1976 meeting with Tyler. (Emphasis added.) · (Schaffer deposition ¶ 10–T90(a).

Despite the above information, Schaffer thereafter wrote and Appellee published the April 1, 1976 article which contained the following:

Other federal sources, however, said that if Curran had not resigned, he would have been asked to resign at a meeting he had scheduled today with Harold Tyler, deputy attorney general with the Justice Department.

Curran described that report as "ridiculous" and added that he had requested the meeting to discuss office busi-

1. Director of the Executive Office for the U.S. Attorney who worked for Tyler and coordinated administrative relations of all U.S. Attorneys in the Department of Justice.

ness. Tyler could not be reached for comment. His assistant, William Gray, declined to comment.

It is my considered judgment that there exists more than sufficient evidence in the record to submit for a jury determination the issue of whether the Appellee "entertained serious doubts as to the truth of his publication. Publication with such doubt demonstrates a reckless disregard to truth or falsity and further demonstrates actual malice." *St. Amant,* supra 390 U.S. 731, 88 S.Ct. 1325.

On April 1st, following the publication of Appellee's morning edition containing the story by reporter Schaffer, Appellee was advised by Deputy Attorney General Tyler's office that the factual statements contained therein were false; that Curran had requested the meeting with Tyler; that Tyler did not plan to ask for Curran's resignation or to fire him. These facts were all set forth in a story carried in Appellee's edition of April 2, 1976. Incredibly, the Appellee newspaper then proceeded to republish the April 1st story in its Sunday edition of April 4th, 1976. As a defense to the allegation of malice for this publication, the Appellee newspaper filed an affidavit of one John E. Severson who prepared the April 4 story. He stated he was not aware of the April 2nd article in his employer's newspaper until after the lawsuit at No. 1476 October Term, 1976 was instituted the following September. Incredible. The Severson affidavit in and of itself is sufficient to carry this case to a fact finder. To grant a non-suit in view of all of the foregoing was reversible error.

I would reverse, remove the non-suit and order the case to trial forthwith.

### Appeal No. 1476

Appellant did resign and was replaced by David W. Marston. On September 23, 1976 Marston conducted a press conference to announce the indictment of Theodore Rubino, Chairman of the Chester County Republican Party, on charges that he had extorted money from architects who had been awarded contracts by Chester County. Appellee's

reporter Schaffer covered the conference. (The same reporter who authored the April 1st article which precipitated the Curran libel action at No. 1475). Marston did not mention Appellant by name at any time during said conference. Irrespective of this admitted fact, on the following day an article reporting on said conference appeared in the Inquirer under the by-lines of reporters Schaffer and Frump. It was an extensive story giving wide coverage to the indictment and bore the headline "CHESCO G.O.P. CHAIRMAN IS INDICTED" and stated in part:

"Marston, who replaced former U.S. Attorney Robert Curran on June 30, also made reference to accusations that Curran did not vigorously pursue white-collar crimes if the suspects were politically well-connected. Both Curran and Marston were appointed by Republican administrations.

"There is no place for politics in prosecution," Marston said of the accusations. "If it's a public corruption case and we can make it, we'll make it."

This could be considered by a fact-finder as an out and out fabrication. This story could not be attributed to either an error in reporting or a reporter merely taking a statement out of context. Appellant's name was never mentioned during the press conference.

This entire situation is replete with uncontradicted facts which demand the submission of the question of malice to a fact-finder. Appellee's reporter Schaffer wrote the story of April 1, 1976. Appellant sued Appellee Inquirer for libel as a result of said story. The Complaint was filed August 27, 1976. Said reporter had to be deeply involved in this litigation. It was her product which ignited it. Reporter Schaffer covered the Marston press conference of September 24, 1976. She states she then called Appellee's reporter Frump, informing him of Marston's remarks during the press conference. She also asserts that she understood those remarks to refer to the numerous public accusations that law enforcement agencies in Philadelphia, including the United States Attorney's office, did not actively pursue political corruption

cases. Frump, in turn "assumed and understood by those remarks that Marston was referring specifically to Mr. Curran."

In the last sentence of paragraph 18 of her affidavit, Schaffer states:

"Mr. Frump advised me that he understood from my account of the press conference that Mr. Marston had referred to allegations concerning Mr. Curran's prosecution of political corruption cases."

Upon the basis of the "assumptions" of reporters Schaffer and Frump, standing alone, the majority would deny the appellant the constitutional right to have the question of malice submitted to a jury. This, in view of the fact that Marston, at no time, mentioned Appellant. Marston did not say "Curran did not vigorously pursue white collar crimes if the suspects were politically well-connected." If these are not Marston's words—whose words are they? To whom is the appellant to look for redress?

I would request the majority to examine paragraph's numbered 21 and 22 of reporter Schaffer's affidavit of January 25, 1977. They read as follows:

21. During my tenure of Federal Court reporter for *The Inquirer,* Mr. Curran made frequent efforts to prevent his staff from speaking with any representative of *The Inquirer,* although they were permitted to speak with representatives of other newspapers, and sought to deprive *The Inquirer* of access to news of legitimate and important public interest and concern. Mr. Curran at times refused to provide *The Inquirer* with copies of official press releases issued by the United States Attorney's Office and made freely available to representatives of other newspapers and electronic media, and denied *The Inquirer* access to the morning report, a schedule of daily activity for the United States Attorney's Office.

22. It is my belief that Mr. Curran's actions as aforesaid were intended to ascertain the identity of, and thereafter harass or punish, those who talked to representatives

of *The Inquirer,* and thereby punish *The Inquirer* by silencing its sources of information."

The facts set forth above, when added to her involvement in the litigation instituted by Appellant as the result of her April 1, 1976 story; when added to reporter Frump's statement that he understood from her account of the press conference that Marston had referred to the allegations concerning Appellant Curran, (Schaffer affidavit, paragraph 18) when, in fact, there was no such reference, all lead to the inescapable conclusion that there was sufficient evidence of malice to submit this matter to a jury.

The majority asserts that the Appellant has merely alleged malice and that said allegation is not enough to defeat the motion for summary judgment for there is no such evidence as affords reasonable support in the record for a finding of knowing or reckless falsehood.

I disagree.

In my opinion it would be difficult to structure a situation involving a major, metropolitan newspaper, wherein there could exist much more evidence to support a finding by a jury of knowing or reckless falsehood, of malice. It is very, very obvious and requires the submission of that issue to a fact finder.

The majority states (page 1352).

"Again, the most that can be said is that appellee's reporter jumped to a conclusion. This does not detract from the defamatory nature of the article; for while the article may be read as only recounting Frump's interpretation of Marston's remarks, it may also reasonably be read as saying that Marston specifically referred to appellant by name. The threshold inquiry we must make, however, is not regarding falsity but malice."

Falsity has been admitted. It is the formulation, the structuring, of the falsity, which resulted from and thus demonstrates, the existence of malice. The record abounds with evidence which will support a finding of malice.

I repeat: Reporter Schaffer authored the April 1 story which resulted in the libel action by Appellant at No. 1475; that suit was filed August 27; Schaffer covered the "Marston" Press Conference September 24; she called reporter Frump and "informed him of the indictment and informed him of Marston's remarks during the press conference" (Schaffer affidavit paragraph 16). In paragraph No. 7 of his affidavit, Frump states that he understood from Marston's remarks (as related to him by Schaffer) that Marston was referring specifically to Appellant Curran; Marston made absolutely no reference or accusation about Appellant Curran; Appellee admitted this in an article appearing September 26, 1976. In paragraphs 21 and 22 of her affidavit, reporter Schaffer swears Appellant sought to deprive the Inquirer of access to news emanating from his office; failed to accord the Inquirer the same consideration as accorded other media representatives, denied the Inquirer access to the Morning report; that Appellant intended to harass or punish employees of his office who talked to representatives of the Inquirer and *thereby punish the Inquirer by silencing its sources of information.*"

In connection with the within subject matter, the United States Supreme Court has stated in *Gertz v. Welch,* 418 U.S. 323 at page 340, 94 S.Ct. 2997, at page 3007:

"But there is no constitutional value in false statements of fact. Neither the intentional lie nor the careless error materially advances society's interest in 'uninhibited, robust, and wide-open' debate on public issues. *New York Times Co. v. Sullivan,* 376 U.S., at 270, 84 S.Ct. 710. They belong to that category of utterances which 'are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.' *Chaplinsky v. New Hampshire,* 315 U.S. 568, 572, 62 S.Ct. 766, 86 L.Ed. 1031 (1942)."

In discussing the opinion of the lower court in *Gertz,* the Supreme Court said in part, in footnote 2, on page 329, 94 S.Ct. on page 3002:

"It is clear that the trial court gave petitioner no reason to assume that the *New York Times* privilege would not be available to respondent. The court's memorandum opinion denying respondent's pretrial motion for summary judgment does not state that the *New York Times* standard was inapplicable to this case. Rather, it reveals that the trial judge thought it possible for petitioner to make a factual showing sufficient to overcome respondent's claim of constitutional privilege. It states in part:

'When there is a factual dispute as to the existence of actual malice, summary judgment is improper.' "

I urge this construction upon this court.

In *Garrison v. Louisiana,* 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125, the Court further said:

"The use of calculated falsehood . . . [puts] a different cast on the constitutional question. Although honest utterance, even if inaccurate, may further the fruitful exercise of the right of free speech, it does not follow that the lie, knowingly and deliberately published about a public official, should enjoy a like immunity . . .

"For the use of the known lie as a tool is at once at odds with the premises of democratic government and with the orderly manner in which economic, social, or political change is to be effected . . . Hence, the knowingly false statement and the false statement made with reckless disregard of the truth, do not enjoy constitutional protection." (p. 75, 85 S.Ct. p. 216)

In 1976, that court reaffirmed, in dictum, that ". . . inaccurate and defamatory reports of facts, [are] matters deserving no First Amendment protection . . ." *Time, Inc. v. Firestone,* 424 U.S. 448, 457, 96 S.Ct. 958, 967, 47 L.Ed.2d 154 (1976).

A plaintiff public official is not to be automatically deprived of the right to have a jury pass upon the question of malice simply because the publisher-defendant submits an affidavit certifying as to his good faith:

"The defendant in a defamation action brought by a public official cannot, however, automatically insure a

favorable verdict by testifying that he published with a belief that the statements were true. The finder of fact must determine whether the publication was indeed made in good faith. Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant [or] is the product of his imagination." *St. Amant v. Thompson,* supra, 390 U.S. p. 732, 88 S.Ct. p. 1326.

The majority concludes as follows (p. 1348):

When a public official sues a newspaper for defamation, the court must on a motion for summary judgment make a threshold inquiry into actual malice: Unless the court finds on the basis of pretrial affidavits, depositions, and documentary evidence that the plaintiff can prove actual malice in the New York Times sense, it should grant summary judgment for the defendant. *Bon Air Hotel, Inc. v. Times, Inc.,* supra; *Wasserman v. Time, Inc.,* supra (WRIGHT, J., concurring). It is not enough for the plaintiff, in resisting summary judgment, to argue that there is a jury question as to malice; he must make a showing of facts from which malice may be inferred. *Thompson v. Evening Star Newspaper Co.,* 129 U.S.App. D.C. 299, 394 F.2d 774 (1968). *Accord, Oliver v. Village Voice, Inc.,* 417 F.Supp. 235 (S.D.N.Y.1976), *Meeropool v. Nizer,* 381 F.Supp. 29 (S.D.N.Y.1974). See also *Bandelin v. Pietsch,* 563 P.2d 395 (Idaho, 1977), *cert. denied,* 434 U.S. 891, 98 S.Ct. 266, 54 L.Ed.2d 177 (1977). Such an inference must be clear. Cf. *New York Times Co. v. Sullivan,* supra.

Examining the within record in a light most favorable to Appellant, as we are bound to do, the court is mandated to find, from the documentary evidence, that the appellant has made a showing of facts from which malice may be inferred. If malice cannot be inferred from the facts present in the within record, then I submit, the required inference is completely beyond the realm of possibility. I respectfully submit the *inference* is crystal clear. It strikes you right between the eyes.

It is apparent that there exists sufficient evidence upon which a jury could base a finding that the publication in question extends beyond the bounds of constitutionally protected journalism, and is therefore sufficient to support a finding of knowing or reckless falsehood.

This summary judgment entered by the court below was improper. I would reverse and order the matter to trial.

JACOBS, President Judge, and PRICE, J., join in this opinion.