## Angle v. Easton Publishing Company

*Dennis A. DeEsch,* for plaintiff.
*Ronald W. Shipman, April L. Cordts,* for defendants.

VAN ANTWERPEN, *J.*, October 24, 1984 — Plaintiff Ronald L. Angle seeks damages for an allegedly defamatory article published in 1983 by defendant Easton Publishing Co., a general circulation newspaper, and one if its reporters, Mr. Nicholas G. Katsarelas. The matter comes before us by way of the motions of both these defendants for summary judgment. Pa. R.C.P. 1035(d) provides that when a motion for summary judgment is made with depositions, affidavits, or interrogatories, "an adverse party may not rest on the mere allegations or denials of his pleading, but his response by affidavits or otherwise . . . *must set forth specific facts* . . ." If he does not so respond, summary judgment, if appropriate, shall be entered against him. Accord, Amabile v. Auto Kleen Car Wash, 249 Pa. Super. 240, 376 A.2d 247 (1977). In the matter before us, the parties have chosen to rest upon the depositions of four persons[1] and certain exhibits attached thereto. Each deposition concerns a separate factual matter and neither factually contradicts the other.

These depositions clearly establish Ronald L. Angle is employed in real estate and investments and, in 1983, was an announced candidate for Northampton County Council and a director of the Bangor Area School District Board. Plaintiff had also served two terms as a member of Council of the Borough of Portland, Pa. By his own admission, he often spoke out on civic issues and had appeared in the press on no less than 60 or 70 occasions. His picture appears in various articles and headlines

---

1. The deposition of plaintiff Ronald L. Angle taken November 9, 1983, the deposition of defendant Nicholas G. Katsarelas taken March 27, 1984, and depositions of two attorneys, Karl F. Longenbach and George A. Heitczman, taken July 13, 1984.

have frequently referred to him merely as "Angle". After some discussion in the deposition about his initial personal view that he was not a public figure, he conceded that "If by appearing in your newspaper quite frequently constitutes a public figure, I was a public figure."

For some years, Mr. Angle had known an elderly gentleman named Donald Synder, Sr. Mr. Synder's mental condition had deteriorated and, in 1982, Karl F. Longenbach, Esq., was appointed as his guardian. In 1983, after Mr. Snyder entered the County Home at Gracedale, he was interviewed by caseworkers of the Agency on Aging, who determined that sometime around 1980 he had endorsed $15,000 of his bank certificates of deposit and combined them into one certificate of deposit in the names of "Donald D. Snyder, Sr. or Ronald L. Angle." In March, 1981, Mr. Angle withdrew these funds.

Following this, a discussion was held in which Mr. Snyder's guardian, Karl F. Longenbach, Esq., and George A. Heitczman, Esq., agreed that a court action would be filed because Mr. Angle "had possibly obtained monies of Mr. Snyder improperly." The suit asked for an accounting from Mr. Angle of all monies he ever received from or on behalf of Mr. Snyder and asked that he be declared a "trustee ex maleficio." This action was ultimately settled by Mr. Angle paying the sum of $10,000 and, after the suit had been filed, Mr. Angle explained that the $15,000 had been due him by reason of debts of $8,500 owed him by Mr. Snyder and a gift from Mr. Snyder of $6,500.

Once the pleadings were filed in the court's public offices, they were read by defendant Nicholas G. Katsarelas, a reporter for defendant newspaper, Easton Publishing Co. After looking up the mean-

ing of "trustee ex maleficio" in a legal dictionary, calling Mr. Angle, and checking prior stories about Mr. Angle, Mr. Katsarelas wrote a story about the suit using a computer terminal. Some minor editorial changes were made in the story, and, on March 2, 1983, the story appeared in "The Express", a daily newspaper published by defendant Easton Publishing Co. The story read as follows:

"EASTON—Ronald L. Angle, a member of the Bangor Area School Board and candidate for Northampton County Council, has been accused of taking $15,000 from a 72-year-old mental incompetent.

'The allegations are completely unfounded,' Angle said when reached at home this morning.

After making his initial response to the suit, Angle later decided not to make any further comment.

'That's unusual for me, but in this particular case, I don't think it's appropriate for me to make a comment,' he said.

'It's a legal matter,' Angle added, 'and it will be decided by the courts.'

Angle allegedly stole three certificates of deposit and proceeds of Social Security and pension checks belonging to Donald Snyder Sr., who was adjudged last year as an incompetent and is now living at Gracedale, the Northampton County home for the aged.

The accusations were contained in a suit made public today, which was filed against Angle by George A. Heitczman, an attorney representing Snyder. The legal action was brought in Northampton County Court.

Angle, a 36-year-old Johnsonville resident whose outspokenness has made him one of the more controversial political figures in the county, two weeks ago announced his candidacy for a seat on North-

ampton County Council. He formerly served on the Portland Borough Council and owns several pieces of real estate in the county.

According to the suit, Angle 'assumed responsibility for the care of Donald Snyder Sr. and more particularly for the money . . . Snyder had on deposit in banks and which he received on a monthly basis from Social Security and from a pension.'

The certificates of deposit, worth $15,000, were issued by Merchants National Bank of Bangor, the suit contends.

'Sometime during 1977, under unknown circumstances, Ronald L. Angle was added as a joint tenant with right of survivorship to said certificates of deposit,' the suit alleges. 'On March 13, 1980, Ronald L. Angle redeemed the said certificates of deposit, thereby obtaining $15,000.'

The suit also contends Angle received the proceeds of Social Security and pension checks of Snyder, who last year was deemed to be suffering from mental infirmities, mental illness and old age, the suit says.

It is alleged that Angle 'voluntarily' and with no legal rights took over Snyder's financial matters.

'Donald Snyder Sr. has never benefited from use of said funds, nor has he ever been provided with an accounting of same,' the suit alleges. It also contends that Snyder neither made any gift of $15,000 to Angle, nor gave anything to the school board member.

The legal action demands that Angle be ordered to account to Karl Longenbach, Snyder's guardian, for all the money he allegedly received from Snyder. In addition, the suit requests that Angle return any funds he allegedly received, directly or indirectly, from Snyder.

A hearing on the matter has been slated for 9:30 a.m. March 25 in the Northampton County Courthouse."

Plaintiff claims that the words "Angle allegedly stole three certificates of deposit" are libelous and defamatory, and has filed the instant suit. The complaint and cause of action is restricted to these words alone in the article of March 2, 1983. Plaintiff testified at his deposition that he did not think that there was a conspiracy on the part of the Easton Publishing Co. to harm his candidacy for county council, nor did he believe that the reporter or anyone employed by the Easton Publishing Co. wrote the article with an intention to harm him.

The First Amendment of the Constitution of the United States of America provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances." By virtue of the Fourteenth Amendment, the restrictions of the First Amendment apply to the states. Gitlow v. New York, 268 U.S. 652, 666, 69 L.Ed. 1138, 1145, 45 S. Ct. 625 (1925); Schneider v. State, 308 U.S. 147, 160, 84 L.Ed. 155, 164, 60 S. Ct. 146 (1939). "[I]t is a prized American privilege to speak one's mind, although not always with perfect good taste, on all public institutions." Bridges v. California, 314 U.S. 252, 270, 86 L.Ed. 192, 207, 62 S. Ct. 190, 159 A.L.R. 1346 (1941).

With the foregoing principals in mind, the United States Supreme Court, in 1964, handed down its historic decision in New York Times Co. v. Sullivan, 376 U.S. 254, 11 L.Ed. 2d 686, 84 S. Ct. 710, 95 A.L.R.2d 1412 (1964). Sullivan, a commissioner supervising the Montgomery, Alabama, police depart-

ment, had recovered a $500,000 verdict against the New York Times and other defendants because they had published a false statement about police actions, including the padlocking of a dining hall to starve students into submission. Unlike the case at bar, the Times did not make any effort to confirm accuracy by contacting anyone involved or researching its files or other stories before publishing the statement. In reversing, the Supreme Court stated the following rule at page 279 (L.Ed. p. 706):

"The constitutional guarantees require, we think, a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not."

This public official exception was later extended by the court to include public figures in Curtis Pub. Co. v. Butts, 388 U.S. 120, 87 S. Ct. 1975, 18 L.Ed.2d 1094 (1967). The Supreme Court of Pennsylvania has followed this Constitutional mandate and required a showing of actual malice when plaintiff was either a public official, Fox v. Kahn, 421 Pa. 563, 221 A.2d 181 (1966), or a public figure. Corabi v. Curtis Pub. Co., 441 Pa. 432, 273 A.2d 899 (1971); accord, Restatement (Second) of Torts §580A (Tent. Draft No. 21, 1975).

The United States Supreme Court most recently defined public persons or figures in Gertz v. Robert Welch, Inc., 418 U.S. 323, 342, 345, 94 S. Ct. 2997, 3008, 3009, 41 L.Ed.2d 789 (1974), as:

"[t]hose who, by reason of the notoriety of their achievements or the vigor of and success with which they seek the public's attention. . . . Hypothetically, it may be possible for someone to become a public figure through no purposeful action of his

own, but the instances of truly involuntary public figures must be exceedingly rare. For the most part those who attain this status have assumed roles of especial prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved. In either event, they invite attention and comment."

The court added also that a public figure was one who had "general fame or notoriety in the community." Id., at 351-352, 94 S. Ct. 3013.

The facts and admissions of plaintiff demonstrate beyond question that he is a public figure within the meaning of the foregoing cases. The issue becomes then one of whether or not we can enter summary judgment in favor of defendants for want of actual malice.

Initially, the view was taken that in First Amendment cases summary procedures are essential to protect persons and newspapers from the harrassment of lawsuits which would inhibit public debate. Washington Post Co. v. Keogh, 125 U.S. App. D.L. 32, 365 F.2d 965 (1966), cer. den., 385 U.S. 1011, 17 L.Ed.2d 548, 87 S. Ct. 708 (1967); Wasserman v. Time, Inc., 138 U.S. App. D.C. 7, 9, 424 F.2d 920 (1970); Curran v. Philadelphia Newspapers, Inc., 261 Pa. Super. 118, 395 A.2d 1342 (1978). Some doubt has since been cast upon this rule because proof of actual malice calls a defendant's state of mind into question and does not readily lend itself to summary disposition. Hutchinson v. Proxmire, 443 U.S. 111, 61 L.Ed.2d 411, 99 S. Ct. 2675 (1979); Brophy v. Philadelphia Newspapers, Inc., 281 Pa. Super. 588; 422 A.2d 625 (1980). We

note in particular the instructive language in Brophy at page 631:

"The standard against which the evidence is to be examined is that of New York Times and its progeny. But the manner in which the evidence is to be examined in light of that standard is the same as in all other cases in which it is claimed that a case should not go to the jury."

We accept the standard as enunciated above in Brophy noting that Pa. R.C.P. 1035(b) provides that summary judgment shall be rendered if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." We note further that in reviewing the record, the court must accept as true all well-pleaded facts in the non-moving party's pleadings, giving the non-moving party the benefit of all reasonable inferences to be drawn therefrom. Judgment can only be granted in cases clear and free from doubt. Just v. Sons of Italy Hall, 240 Pa. Super. 416, 368 A.2d 308 (1976); Ritmanich v. Jonnel Enterprises, Inc., 219 Pa. Super. 198, 280 A.2d 570 (1971).

Before discussing the evidence under the foregoing standards, we consider further the rule of actual malice enunciated in New York Times Co. v. Sullivan, supra. A showing of no more than negligence, carelessness, bad judgment or inaccuracy in the preparation and publication of an allegedly defamatory newspaper article is constitutionally insufficient to show the recklessness needed to prove actual malice. New York Times Co. v. Sullivan, supra., 376 U.S. at 287-88, 11 L.Ed.2d at 711, 84 S. Ct. at 730. Malice has been interpreted as "an extreme departure from the standards of investigation and re-

porting ordinarily adhered to by responsible publishers." Curtis Publishing Company v. Butts, 388 U.S. 130, 155, 87 S. Ct. 1975, 1991, 18 L.Ed.2d 1094, 1111 (1967).

As the court said in Brophy v. Philadelphia Newspapers, Inc., supra., at page 629:

"What constitutes a reckless disregard of the falsity of a statement was clarified in St. Amant v. Thompson, 390 U.S. 727, 88 S. Ct. 1323, 20 L.Ed.2d 262 (1968):

"[C]ases are clear that reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant, in fact, entertained serious doubt as to the truth of his publication. Publishing with such doubts shows reckless disregard to truth or falsity and demonstrates actual malice."

Mindful of all of the foregoing, we have made an exhaustive review of the facts before us and we can find no facts amounting to malice or from which malice might be inferred. Quite to the contrary, defendants acted with considerably more caution than did defendants in New York Times Co. v. Sullivan, supra.

The reporter took the time to look up the meaning of the legal term he was dealing with and also contacted plaintiff, who, except for a brief statement, refused further comment or explanation at that time. We cannot reasonably expect an average newspaper reader to understand technical legal terms. Black's Law Distionary defines "Trustee Ex Maleficio" as:

"A person who, being guilty of wrongful or fraudulent ·conduct, is held by equity to the duty and liability of a Trustee, in relation to the subject matter,

to prevent him from profiting by his own wrong."

The word "steal" has been defined in Black's Law Dictionary as follows:

"This term is commonly used in indictments for larceny, ('take, steal, and carry away'), and denotes a commission of theft, that is, the felonious taking and carrying away of the personal property of another, and without right and without leave or consent of owner . . . "

Although we are well aware of technical legal distinctions between these two terms, the substitution of one term for the other in a newspaper cannot be said to be a reckless disregard for truth or falsity amounting to malice.

As the court said in Brophy v. Philadelphia Newspapers, Inc., supra., at page 633, when it granted summary judgment in favor of defendants:

"The record does not disclose sufficient evidence from which a jury could infer that appellees engaged in 'highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers.' . . . The reporter's introduction to his article may have been couched in strong or possibly sensational terms but such hyperbole without more does not give rise to an inference of actual malice. See Greenbelt Cooperative Publishing Association, Inc. v. Bresler, 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970). At the very most, the evidence supports a finding that appellees exercised bad judgment or were careless in preparing the article and its headline. As we noted earlier, mere negligence or inaccuracy cannot substitute for knowing falsehood or reckless conduct."

The language of Brophy is equally applicable to the case at bar in which it is clear from the facts and plaintiff's own admission that there was "no inten-

tion to harm him", that no jury questions are presented. Accordingly, we conclude that the publication by defendants is protected by the First Amendment of the Constitution of the United States of America, and grant summary judgment in favor of defendants. In so doing, we need not decide whether the publication is also protected by defendants' qualified privilege to report judicial proceedings,but we note in passing that it would appear that it is.[2] Simply stated, if a newspaper cannot inform the public of serious matters involving those seeking public office, then what exactly have we been fighting to defend for the last 200 years.

Wherefore, we enter the following

## ORDER OF COURT

And now, this October 24, 1984, defendants' motions for summary judgment are hereby granted and judgment is entered in favor of defendants Easton Publishing Co. and Nicholas G. Katsarelas.

---

2. See for instance, Binder v. Triangle Publications, 422 Pa. 319, 275 A.2d 53 (1971).